By the Court, McCunn, J.
In disposing of this case, it will be necessary to give a careful consideration to the question of the alleged unseaworthiness of the ship at the inception of the voyage, as the counsel for the defendants rely principally upon that fact, and also upon the fact, that -the verdict is against the weight of evidence, and is not in accordance with the charge of the learned Chief Justice, who tried the case. ,
■A number of witnesses, and some of them agents and employees of the defendants’ company, who had closely examined the ship before she sailed, testified, as far as they were able to judge, that she was a good, staunch vessel. This the captain also testifies to, and he is corroborated most fully in this respect by the testimony of Mr. Poillon. Mr. Poillon is a most respectable and very intelligent witness, and his testimony should have very great weight in this case; moreover, he is interested as stockholder and director in this very company.
He testifies, the ship was known to him since she was built; that she was one of the best built ships belonging to New York; that he had done a great deal of work on her, from time to time ; that he had bored her timbers through and through in 1860, for the purpose of rebuilding her ; and that he then examined her condition, and she proved to be staunch and sound in every part.
It is also proven that the ship was but fifteen years old; *204 that she was huilt of white oak; that she had been a most successful ship, in all her previous voyages; that she was stout, staunch and sea worthy; that on her previous voyage across the Atlantic, six weeks before this unfortunate voyage was undertaken, her cargo, of salt in bulk, was delivered in the very best condition. . • ■
That Captain Walsh, Mr. Poillon’s foreman, and Mr. Poillon himself, again examined her in April, 1862, by cutting out some of her bends, in some ten places, and looking at her timbers, and they were then found to be sound.
That the ship was recaulked, and her beams and bolts were examined in Liverpool, before sailing on her last return voyage, and she was found at thisi late period to be staunch and strong. Besides, the company had every opportunity to examine the ship ;. they knew her age : they saw the cargo go pn board; they closely scrutinized and examined her, when the stevedores were at work; in fact, from all that appears in the evidence, they knew, or might have known, as much about the ship as the owners did, and the insuring of her under these circumstances, was one of those reasonable risks incident to this kind of insurance.
To establish the unseaworthiness óf the ship, at the time of her departure, the defendants offered the evidence of the first mate, Shute, who testified that he had taken a falsa oath in swearing to the proof of loss, and the evidence of the second mate, Thompson, a person of very bad repute, to say the least. These witnesses, however, did not testify that the ship was unseaworthy when she left the port. They testified, simply, that the weather was moderate, and that the ship was scuttled; and this charge of scuttling, even.if true, could not, in the slightest degree, affect this policy, unless the defendants could prove that there was collusion between the captain and the owners, but of which there is not a single particle of evidence. The jury were justified in not crediting the testimony of Shute and Thompson, and we must assume that they did. not believe their statements either in relation to the vessel or the charges against Captain Cunningham.
*205 From all the testimony in the case, I am clearly of opinion that the plaintiff established the fact that the ship, when she went to sea, was a good, stout, staunch and seaworthy vessel, and that, from her péculiar cargo, and the stress of weather, she foundered.
The carrying of grain, in bulk, on a long voyage over an angry sea, is accompanied with more danger than the carrying of any other kind of merchandise ; consequently the greatest care and skill should be exercised in preparing the bins or compartments for the reception of the cargo; for no matter how well a vessel is stowed, with this kind of merchandise, the planking of the floors and bins will sometimes give away, as the ship lurches or stands away on her new course, and the grain will necessarily run to the pumps, and prove to be most disastrous. This danger becomes more alarming when the vessel is beset with head winds and the crew are called upon frequently to wear ship, as was proven to be the case in this instance.
It is in evidence in this case, that the wind blew from every point of the compáss, sometimes blowing heavy with squalls, and with a heavy cross sea, setting almost always in a contrary direction to the ship’s course.
The protest, or notice of loss of the ship, although only received in evidence as part of the preliminary proof of notice of loss, yet to my mind it contains a true history of the cause of the disaster. This statement of loss was made by the witness Shute, and five of the seamen, immediately after the loss occurred,.and there is no doubt that it was principally made up from the log of the ship. It states that immediately after going to sea, she encountered heavy weather; and some of her sails were carried away; that the sea ran high, and a heavy swell set in; that the ship was placed under double reefed topsails, with staysail and trysail set for the purpose of keeping her head to the swell; on the following day' heavy weather still continued and a leak gained ; the ship’s rudder head broken, and she laboring heavily. The next day (25th) the weather continued about the same ; although both pumps *206 going, the water from the leak was gaining fast; and the ship was headed for St. Johns, Newfoundland. The succeeding day (26th) a vessel came in sight, and the captain and crew of the Senator were taken from the wreck, in half an hour after which the ship foundered.
This is á brief outline of the protest as it was sworn to by Shute, and flatly contradicts his testimony given on the trial of this case, and corrroborates that of Captain Cunningham, and is therefore of vital importance. Captain Cunningham testifies that he took the ship to sea on the 22nd of August. The wind was then southward ; it was raining and blowing a pretty strong breeze, with a very heavy easterly sea. Next day the wind changed to the northward and westward, and blew heavily, and the grwin came up in the pumps. On the third day the pumps were going all the time. The wind had been all around the compass, and the weather squally, with a very heavy cross sea—the ship laboring heavily. That part of the time they were running under double reefed topsails, staysail and reefed spanker.' This certainly was heavy weather. And this statement of the captain, almost identically corresponds with the entries in the log book, which was kept by Shute ; and I can easily conceive how an American ship, fifteen years old, with a cargo of grain, deeply laden, under such a stress of weather, and in such a sea, could founder, in the manner described by the captain.
It is a well settled rule of law, that the assured only warrants the seaworthiness of the ship, at the begining of the voyage; if she becomes unseaworthy after that, from any cause whatever, the underwriters are liable. (Sherwood v. Ruggles, 2 Sandf. 55. Potter v. Suffolk Ins. Co., 2 Sumner C. C. R. 197. 1 Arnould on Ins. by Perkins, § 245.)
And it is also a well settled rule of law, that when a vessel is wrecked, or founders at sea,' shortly after sailing, without any stress of weather or storm sufficient to destroy or impair a sound ship, but founders in ordinary sea-going weather, the presumption is, that the loss of the ship arises from decay or some inherent defect in her material, and that the insurers, un *207 der such circumstances, are exempt from the risk; and such the learned chief justice charged to be the rule of law in this, case.
The request of the defendants’ counsel to charge upon the foregoing proposition of law was embraced in the charge of the learned chief justice. The court in charging a jury, is not bound to follow the precise language or words of counsel; it is enough that the propositions of law are fairly laid down, substantially as requested.. (Holbrook v. Utica and Schenectady R. R. Co., 2 Kern. 236. Sperry v. Miller, 16 N. Y. Rep. 413. Bulkeley v. Keteltas, 4 Sandf. 450.)
The only conflict of evidence, I find, is that created by the evidence of Shute and Thompson, in swearing that the ship had moderate weather until she foundered.. This, however, is directly contradicted by the testimony of Captain Cunningham, as to the state of ihe weather, and by other testimony tending to show the vessel was seaworthy at the time she left the port. The chief justice was, therefore, correct in submitting this conflict of evidence to the jury as a question of fact for them to determine ■; and the jury having passed upon such evidence, and having found the question of seaworthiness in favor of the owners, this disposes of the case, as far as the question of the weight of evidence upon that question is concerned.
As to the question of a nonsuit, the plaintiff, when he rested, had clearly made out a case, within the terms of the policy. The action was properly brought, and he had proven sufficient to sustain his right to recover. The policy was in substance with him for the benefit of all the owners, and in this there was no ambiguity. The plaintiff was suing as trustee for others. This he had a right to do, under the Code. (§ U3.)
It was not necessary that the particulars of loss should be stated in the preliminary proof • and there is no variance between the evidence and proof. Therefore the grounds upon which the motion for a nonsuit was based, were not well taken. (Talcot v. Marine Insurance Co., 2 John. 136.)
A large number of authorities are cited by the defendants’ *208 counsel, which do not apply to the questions involved in this case. The case of Warren v. United Ins. Co., (2 John. Cas. 231;) Court v. Del. Ins. Co., (2 Wash. O. C. 48;) Wright v. The Orient Mutual Ins. Co., (6 Bosw. 280;) Kinsman v. The York Mutual Ins. Co., (5 id. 460;) Talcot v. The Commercial Insurance Co., (2 John. 124;) Barnwall v. Church, (1 Caines, 217;) Mumford v. Smith, (Id. 520;) and Watson v. Clark, (1 Dowl. Pr. 336;) are cases where the vessels, after springing a leak, and after being disabled, were brought into a harbor of safety, and the real cause of the disaster ascertained. It is true, that in the case of the Midsummer Bloom, (1 Dowl. Pr. 336,) the captain, after discovering the disaster to the ship, and after making for a port of safety, got upon a reef at the entrance of the Belize river, and was then lost; yet from portions saved from the wreck, the cause of the inherent defect in her timbers was ascertained to a certainty, to exist at the inception of her voyage. It may be urged that in the case of Paddock v. The Franklin Ins. Co., (11 Pick. 227,) and Talcot v. The Commercial Ins. Co., (2 John. 124,) the vessels foundered before reaching a port of safety ; but in both cases the court set aside the verdict, simply on the ground of the very great preponderance of proof in favor of the insurers. In this case the great preponderance of proof is the other way.
The question has been raised, that because a ship’s carpenter was not employed on the voyage, the ship was unseaworthy, and a number of cases are cited as analogous to this case. On short voyages, where extra spars and cordage can be easily carried, a carpenter is 'not necessary. Such is the uncontradicted testimony, in this case, of an experienced ship master, Joseph Webster. The case of the brig Eliza, tried in 1811, and reported, 10 John. 58, was a case of extreme neglect, on the part of the ship’s carpenter. The brig, after being at sea for about six weeks, on a voyage from Hew York to Bordeaux, was found to be without fuel and candles; so that for want of light she could not navigate at night, but was obliged to heave *209 to ; at the same time she was approaching a dangerous coast. There is nothing so necessary on board of a ship, at such a crisis, as, at least, light enough to enable the ship to discover the indications of her compass. Indeed, a ship might as well go to sea without a compass, as go without light; for without the latter, the courses indicated by the compass could not be observed. In the case of The Minorca, (1 Camp. 116,) it was proven, and not disputed, that the sails were so defective that the ship could not keep up with her convoy. And I need not remark, that in those days good sails were the most essential requisite of the ship. The case of the ship Mary, of Stromness, is not a case in point; although it must be admitted, that proper anchors are essential parts of the equipment of a ship, so as to prevent calamities on dangerous lea shores or rocks. The case of the ship Eliza, (Bell v. Car stairs, 14 East, 374,) decided in 1811, has no application. There the owners neglected in time of war to provide the proper neutral papers for the ship; so in the case of the ship Pennsylvania, in 1810, (3 Taunt.) In the case of the ship 11 Holly,” reported, 3 Gar. & P. the question was left by Lord Tenderden to the jury, whether the ship was unseaworthy or not, she having gone to sea without a mate. I cannot find the slightest resemblance in any of the above cases to the one under consideration.
The case cited, by the plaintiff’s counsel, of Smith and others v. Bissell and others, (vol. 15 of Decisions in Court of Sessions, in Scotland, pp. 617 to 620,) is a much stronger case in favor of the defendant than this case, and yet in that case it was held that the plaintiffs were entitled to recover.
All the evidence in the cáse was properly received. The admission of irrelevant testimony unobjected to, is not ground for a new trial. The evidence of nautical men was properly received. (Duer on Insurance, 683. Arnould on Insurance, 256. Beckwith v. Sydebotham, 1 Camp. 116.)
It is urged that the master was culpable in not heading sooner for land, when he found his ship in a sinking condition. The best built ships often leak for days after going to sea, when they have been lying up in a dry climate. The captain, *210 no doubt, in this case, supposed that after being at sea for a few days, the timbers and planking would swell and the. leakage stop. Besides, the captain was a competent navigator, and the owners are not liable for his error of judgment, if such error took place. (Copeland v. N. E. Ins. Co., 2 Metc. 432.)
For these reasons, the judgment should be affirmed.