## Ex Parte GFELLER.

### Division Two, December 9, 1903.

1. **Administration:** DISCOVERING ASSETS: AFFIDAVIT. Since the statute authorizes the probate court to issue a citation for the discovery of assets, upon the affidavit of the executor, administrator or "other person interested in the estate," the order of the court issuing such citation on the affidavit of the husband of the testatrix, is a decision by the probate court that such husband is interested in the estate.

2. ———: ———: ———: BY HUSBAND. The husband of a childless testatrix, although her will may · specifically declare that he is to have no part in her estate, has such interest therein as to authorize the probate court, upon his affidavit that certain parties are concealing certain assets, to issue a citation to them for the discovery of such assets.

3. ———: ———: EMBEZZLING ASSETS: DEPOSITION: REFUSAL TO TESTIFY. A proceeding in the probate court to discover assets begun on the affidavit of a person "interested in the estate" in which a certain other person is charged with having concealed and embezzled certain assets, is "a suit pending" within the meaning of the statute concerning the taking of depositions; and the deposition of any other person can be taken therein, even though he is the attorney of the person so charged, and he cannot escape commitment for contempt for refusing to testify on the ground that such a proceeding is a criminal one. In such case, the citation is not void, but at most only void as to the charge of embezzlement, which charge may be abandoned by amendment at any time, and thus the court will be relieved of doubt as to its jurisdiction over the proceeding.

4. ———: ———: ATTORNEY OF DECEASED: REFUSAL TO TESTIFY. One who was attorney for testatrix during her lifetime, can not, in a proceeding by the executor to discover assets. of the estate, refuse to answer an inquiry as to the whereabouts of certain bonds belonging to the estate, on the ground that his knowledge of the matter came to him in his professional capacity as her attorney. The privilege in such case belonged to the testatrix, and after her death to her executor.

5. Evidence: PRIVILEGED COMMUNICATIONS: WAIVER. The protection afforded by the statute against calling a lawyer or physican to give evidence of information acquired by either in his professional capacity, may be waived by the client or patient, or by the legal representative after his death.

6. ———: ———: WAIVER HOW MADE. There can be no stronger waiver by an executor of his right to object to the attorney of the testatrix testifying as to information acquired by him in his professional capacity from the testatrix as to the whereabouts of assets, than a proceeding by the executor to discover assets, and the taking of depositions therein in which the attorney is asked to state his knowledge of the whereabouts of certain named articles.

7. ———: ———: WHAT IS SUCH. No professional confidence is violated by an attorney in telling where he last saw certain bonds and other personal property of testatrix, even though he obtained that knowledge in a professional way from testatrix; and his refusal to testify on that ground, in a proceeding by the executor to discover assets, will not exempt him from commitment for contempt. In such case he may be compelled to testify as to what money was collected by him, when paid over, and to whom paid, what property decedent had, what disposition he made of the same, and when he last saw certain assets, and in whose hands they were.

8. ———: ———: BECOMING ATTORNEY OF ANOTHER. An attorney can not obtain information in a professional way from decedent as to the whereabouts of assets, and after decedent's death escape from testifying in regard thereto by accepting employment from one charged with having concealed such assets. An attorney should not represent two clients with adverse or conflicting interests.

9. ———: DEPOSITION: RELEVANCY OF QUESTIONS. It is for the notary public before whom a deposition is being taken to decide whether a question is relevant or material, and if he decides it to be such, the witness must answer.

10. ———: ———: REFUSAL TO ANSWER QUESTION: INCRIMINATION. A witness can not refuse to answer a question in a proceeding to discover assets of the estate of a deceased person, simply on the ground that a cause is pending in the same court in which he is charged with

having concealed or embezzled certain assets of the estate. If the questions were in respect to matters, the answers to which could in no way tend to incriminate him, that is no excuse for refusing to testify.    And, if the answer should tend to incriminate him, he must claim his exemption on that ground.

## Habeas Corpus.

PETITIONER REMANDED TO CUSTODY OF SHERIFF.

*Geo. D. Reynolds* and *C. W. Holtcamp* for petitioner.

(1)    H. H. Linze, on whose affidavit the citation issued, was neither executor, administrator nor a person interested in the estate.    The answer to the citation sets up the first clause of the will of Mrs. Catherine Linze, by which she cuts off her husband from all interest in her estate.    This will was duly probated, the executor appointed under it is acting under and is bound by it.    Until set aside by decree of court, in a proceeding for that purpose, or directly, this first clause bars Linze of all interest.    The filing of an affidavit by a proper party is jurisdictional.    Eans v. Eans, 79 Mo. 53.    And the executor can not adopt an affidavit filed by one not in interest.    Shaw v. Groomer, 60 Mo. 696. (2)    The proceeding in the probate court is not a "suit pending" in a court of this State within the purview of section 2877, Revised Statutes 1899, which provides for taking of depositions in a "suit pending."    Sections 2637 and 2638, Revised Statutes 1899, provide that a defendant in a criminal proceeding can not be called to testify by the prosecutor, and is only competent as a witness when he offers himself as such.    Gordon v. Eans, 97 Mo. 587; United States v. Shapleigh, 54 Fed. 126. (3)    The probate court can have no jurisdiction, and the Legislature, in attempting to confer power on it to summarily try what is essentially a criminal case, that is, a case in which there is a distinct charge of embezzlement, and in attempting to give the probate court

jurisdiction to punish, by fine or imprisonment, under the guise of attachment for contempt, has attempted unconstitutionally and in evasion of the Constitution to confer upon said court jurisdiction not granted by the Constitution.    This is a criminal case, a prosecution for a crime in all its essential particulars, and jurisdiction over it can not be vested in the probate court.    United States v. Shapleigh, supra; Howell v. Fry, 19 Ohio S. 555; Neenser v. Barrington, 42 Ohio S. 523.    (4)    Answering questions 1, 15, 16, 17, 24, and 25 would involve a violation of professional confidence, and petitioner was not only not bound to answer them, but had no right to do so.    R. S. 1899, sec. 4659; Sweet v. Owens, 109 Mo. 1; Ebersole v. Rankin, 102 Mo. 488; State v. Dawson, 90 Mo. 149; Gray v. Fox, 43 Mo. 570; Johnson v. Sullivan, 23 Mo. 474.

*J. Hugo Grimm* for respondent.

(1)    The executor had the right to take depositions in this proceeding.    Eckerle v. Wood, 95 Mo. App. 378; Ex Parte Priest, 76 Mo. 229; Larimore v. Bobb, 114 Mo. 446; Tyson v. Savings and Loan Association, 156 Mo. 589; Lewin v. Dille, 17 Mo. 64; Ex Parte Mumford, 57 Mo. 603; Cauthorn v. Hoyner, 24 Mo. 236; Ex Parte Livingstone, 12 Mo. App. 86.    (2)    The notary public had authority to commit petitioner for contempt for refusing to answer.    Ex Parte McKee, 18 Mo. 599.    (3) The commitment specially and plainly charged a contempt, and for this reason the prisoner should be remanded.    R. S. 1899, secs. 3576, 3579; Ex Parte McKee, 18 Mo. 599; Ex Parte Priest, 76 Mo. 229.    (4) The proceedings in the probate court on citation against Gfeller are not in any sense criminal proceedings.    The issues are made up by the interrogatories and answers thereto and these present no criminal charge.    R. S. 1899, secs. 75, 77; Tygard v. Falor, 163 Mo. 234; United States v. Shapleigh, 54 Fed. 128; Rothchild v. Ins. Co., 62 Mo.

359. (5) The witness could not refuse to answer a question because he or counsel considered it irrelevant; that was a question for the notary to determine. Ex Parte McKee, supra. He might have declined to answer on the ground that his answer would tend to incriminate him, but he did not place his refusal on that ground. (6) The witness must claim the privilege himself; it can not be claimed by counsel. Therefore the objections made by Eckerle's counsel can not be taken as those of the witness. State v. Wentworth, 65 Me. 234; Commonwealth v. Shaw, 4 Cush. (Mass.) 594; 3 Jones on Evidence, 893; 1 Greenleaf on Evidence (15 Ed.), 457. But if the witness had claimed the privilege, there was no basis for such claim, since it is inconceivable that any answer he might give to the questions put could have had any incriminating effect. Brown v. Walker, 16 U. S. 646. (7) The witness could not refuse to answer on the ground that his answers would disclose confidential communications received from his clients, because: (a) As to the communications received from Mrs. Linze, her executor could, and by calling Gfeller as a witness did, waive the privilege. Thompson v. Ish, 99 Mo. 170; Groll v. Tower, 85 Mo. 256; Carrington v. City, 89 Mo. 216; Weinstein v. Reed, 35 Mo. App. 47; Scripps v. Foster, 41 Mich. 742; Scott v. Harris, 113 Ill; Russell v. Jackson, 9 Hare 393; Blackburn v. Crawford, 3 Wall. 175. (b) As to communications received from Eckerle since the death of Mrs. Linze, they are not privileged, since the privilege extends only to communications having a lawful object. I Greenleaf on Evidence (15 Ed.), sec. 240, note 1; Russell v. Jackson, 9 Hare 391. (8) It is not every communication from attorney to client or all information which an attorney has concerning a client's business and property that is privileged. It has been held that it is proper to inquire about such matters as were covered by the questions in this case. Zobel v. Schrader, 35 Tex. 308; Allen v. Root, 39 Tex. 589; Wil-

liams v. Young, 46 Io. 140; James v. Friedenbourgh, 3
Pa. L. J. 199; 1 Greenleaf Ev. (15 Ed.), sec. 241, and
note *a* to sec. 205; Schaaf v. Fries, 77 Mo. App. 346.

BURGESS, J.—Catherine Linze died at the city
of St. Louis, leaving surviving her her husband, Henry
Linze. In November, 1901, letters testamentary were
duly granted by the probate court of said city upon her
estate, to the St. Louis Trust Company, in pursuance of
her will duly admitted to probate by said court.

On October 11, 1902, the petitioner in this case, Al-
fred Gfeller, was arrested and held in custody by the
sheriff of the city of St. Louis, under a commitment is-
sued prior thereto by one Augustus M. Wood, a notary
public within and for the city of St. Louis. On the
same day Gfeller presented his petition to the Honor-
able Thomas A. Sherwood, one of the judges of this
court, praying for his discharge under and by virtue of
the habeas corpus act. The petition was duly verified,
and the petitioner being brought before Judge Sher-
wood, in chambers at St. Louis, a writ of habeas corpus
was ordered to issue, returnable to this court in term.

The facts are as follows: The estate of one Cath-
erine Linze, being in course of administration in the pro-
bate court of the city of St. Louis, the St. Louis Trust
Company being executor, the widower, Henry H.
Linze, filed in said court two affidavits, in one of which
he charged "that he had good cause to believe, and does
believe, that Alfred Gfeller has concealed or embezzled
various goods, chattels, wares, merchandise, notes, cer-
tificates of deposit, bonds, stock in corporations, and
other property, evidences of debt and choses in action
of the deceased, amounting in the aggregate to between
$40,000 and $70,000, and constituting the bulk of her es-
tate and the said Alfred Gfeller has such property in
his possession, or under his control, and refuses to de-
liver it up to the St. Louis Trust Company, executor of
Catherine Linze, deceased, upon demand made there-

for.'' In the other, Linze charges ''that he has good cause to believe and does believe that Frederick N. Eckerle has concealed or embezzled various goods, chattels, wares, merchandise, household articles, glassware and other personal property of the deceased, the exact value of which the affiant can not state, but which he believes to be over $500 and that Frederick N. Eckerle had such property in his possession or under his control and refuses to deliver them up to the St. Louis Trust Company, executor of Catherine Linze, deceased, upon demand made therefor.''

Gfeller and Eckerle filed answers to the citations, in which they denied that Henry H. Linze had any interest in the estate of his wife, and averred that she died testate without issue, and that the first clause of her will, which had been duly probated, read as follows:

''I declare that I am now married to Henry H. Linze, and that I have no children; and that all the property, real, personal and mixed which I now possess, and which I desire to dispose of hereby, is my absolute property, and that my said husband has in nowise contributed thereto, nor has he any interest therein.''

The answers then severally deny that they have concealed or embezzled any of the various goods, chattels, etc., belonging to the estate of the said Catherine Linze, as charged in the affidavits, or that they have any of them in possession or control, and Gfeller denies that Catherine Linze died seized of an estate amounting to between $40,000 and $70,000 as alleged in the affidavit.

Afterwards the trust company, as executor, filed written interrogatories ''to be answered in writing'' by Eckerle.

Those propounded to Eckerle, and his answers thereto, are as follows:

''Interrogatory 1. Is it not a fact that between November 10, 1901, and November 20, 1901, a large quantity of cut glass, silks, satins, linen, curtains, portiers,

vases, ornaments, clocks and silverware were taken and removed from the residence of Catherine Linze, lately deceased, and that thereafter a portion of said articles came into your possession, custody or control?

"Answer.    Mrs. Catherine Linze was my aunt. She took me to raise when I was about twelve years old. I am now about thirty-five years of age.    As I had a stepmother and could not get along with her, and my aunt didn't have any children, she proposed to my father to take me and pay all my expenses and educate me, clothe me, and to recognize me as her child.    My father assented to this arrangement, and relinquished all supervision and control over me in favor of my aunt, who was then Mrs. Becker, her first husband, Mr. Becker then being alive.    I lived with my aunt, Mrs. Linze, formerly Mrs. Becker, and was recognized by her as an adopted son until about three months before my aunt's death, when I married and set up housekeeping for myself.    About three weeks before my aunt's death she bought a lot of household goods and added to them a lot that was in her house, gave them to me and had them removed to my house.    A day or two before my aunt died, she had two lady friends of hers to remove a picture of herself and my young sister, a clock which I had given her, a lot of dresses, some cut glass ware, mainly the pieces of cut glassware that in the past twenty years I had presented to her, a lot of linen, curtains, mantel ornaments, pictures of relations and a carving set which I had given her, from her house to the house of one of these ladies, with directions to the lady to give them to me.    Afterwards my aunt told me what she had done; that these articles were there for me, and that I should hold them as a sacred gift from her and never sell them.    These are all of the articles specified in the interrogatory which came into my possession, and I hold and claim them as my property, by virtue of

the gift of them of my aunt to me during her lifetime.

"Interrogatory No. 2.   Is it not true that at the time of Catherine Linze's death, and at the time of the service of the citation in this case upon you, you had in your possession, custody or control, the articles mentioned in the last preceding interrogatory, or a portion thereof?

"Answer.   I refer to my answer to interrogatory No. 1.

"Interrogatory No. 3.   Did you at the time of the death of Catherine Linze, or at the time of this citation upon you, or at any intermediate time or at any time since, have in your care, custody or control, any money, bonds, stocks, securities, or other personal property, belonging to Catherine Linze, deceased, or which belonged to her at the time of her death?

"Answer.   No.

"Interrogatory No. 4.   Have you since the death of said Catherine Linze, delivered to any person, firm, society or corporation, any of the moneys, bonds, stocks, securities or other personal property belonging to said Catherine Linze in her lifetime?   If so, state when and where and to whom.

"Answer.   No.

"Interrogatory No. 5.   Did you, prior to the death of Catherine Linze, remove from her residence, any money, bonds, stocks, securities or other personal property? If so, what did you do with same?   And was it in your possession at the time of service of citation on you?

"Answer.   I state that it is fully covered by my answer to interrogatory No. 1, and I refer to that.   I will say in addition that I took nothing whatever from my aunt's house after her death, except that, as her house was small, and to make room for the people who would probably attend her funeral, I removed from her house to a neighboring house a piano and a sewing machine, which were seen and taken up into the inventory by the executor.   I also took away from the room that I had oc-

cupied some clothing and personal belonging, such as a guitar, mandolin, and a lot of shirts and underwear, which had always been mine, and which I took to my own house the Monday after my aunt's death. I had kept my musical instruments there at my aunt's request, because she liked to have me play for her own and for her visitors' entertainment. Her husband, Mr. Linze, although living in the city, never went to see her, and she was entirely alone, except for the visits paid her from time to time by myself and wife. Although I had gone to Mr. Linze's place of business, and told him of my aunt's deserted condition since I had left the house, and begged him to try and make up with her, he refused to do so.''

After the filing of the answers to the interrogatories by Gfeller and Eckerle, the executor proceeded to give notice of the taking of depositions in both cases, before H. M. Wood, a notary public.

In the case against Gfeller, the circuit court, on motion, appointed Hon. Daniel Dillon to take the testimony. Eckerle's testimony was taken over objection and on application of the counsel for the executor, to have Gfeller sworn; he declined, and Judge Dillon refusing to compel him to testify, certified the matter to the circuit court, where it is now pending.

On or about May 1, 1902, the trust company caused notice to be given to Eckerle for the taking in this proceeding of depositions of witnesses on May 6th. Before any testimony was taken under said notice, said Eckerle applied to the presiding judge of the St. Louis Court of Appeals, for a writ of prohibition against the said trust company, and the notary before whom the depositions were to be taken, to prohibit their proceeding under the notice given. A preliminary rule was made, and after a return by respondents, the St. Louis Court of Appeals discharged the preliminary rule of prohibition, and entered judgment for the defendants.

After the decision of said matter by the St. Louis Court of Appeals, the St. Louis Trust Company, in August, 1902, caused another notice of the taking of depositions in the said proceeding against Eckerle in the probate court to be served upon him, and under said notice began the taking of depositions on the 27h day of August, 1902. The taking of said depositions was proceeded with day after day, and on the 22d of September, 1902, after a number of witnesses had been examined, the petitioner, Alfred Gfeller, was sworn as a witness, and the taking of his deposition in said cause was begun. On that day, however, he was excused until September 25th, the depositions being continued from day to day in the meantime. On September 25th the examination of Gfeller was proceeded with, and the following questions were put to him by counsel for executor:

"Q. 1. When did you last see St. Louis Brewing Association bonds numbered 4450 to 4468 inclusive, or any of them, these bonds being for $1,000 each and having belonged to Mrs. Linze, during her lifetime?

"Q. 2. Did you, at the time of Mrs. Linze's death or shortly prior thereto, have in your possession any moneys belonging to her, if so, what did you do with it?

"Q. 3. Did you ever see bonds of the city of Houston, Texas, numbered 1070 to 1076, inclusive, which were for $1,000 each, or any of them, which belonged to Mrs. Linze during her lifetime, if so, when did you see them last?

"Q. 4. Did you ever see five bonds of New Orleans Brewing Association for $1,000 each, or any of them, which belonged to Mrs. Linze during her lifetime; if so, when?"

Questions 5 to 14 were in the same form as those above, except that other securities were inquired about.

"Q. 15. I asked you whether Frederick N. Eckerle did not leave the city of St. Louis, within four or

five weeks after Mrs. Linze's death, and go to his rel-
atives in Germany, and did he not do so before you dis-
closed to the St. Louis Trust Company the existence of a
safe deposit box in the Mississippi Valley Trust Com-
pany which was in the joint names of yourself and Mrs.
Linze? You declined to answer this question the other
day, claiming that the information came to you in a pro-
fessional capacity from clients, and I asked their names
and you refused to give them. Do you still refuse to
answer the main question, and also refuse to give the
names of the client from whom you received this infor-
mation?

"Q. 16. You stated that when you responded to
the message from Mrs. Linze saying that she wished to
see you and you called at her house on Saturday, No-
vember 9, 1901, and that you had a conversation with
her, the substance of which you decline to give. Do
you still decline to give that conversation?

"Q. 17. Did that conversation have reference to
her property and securities?

"Q. 18. Where did Mrs. Linze keep her securi-
ties so far as you know?

"Q. 19. Before Mrs. Linze's death did you have
any money of hers in your possession?

"Q. 20. If so, what did you do with it?

"Q. 21. Did you not on the day of her funeral
pay cne or more of her servants?

"Q. 22. Did you not make these payments out of
her money, and where did you get it from?"

All of which Gfeller refused to answer, for the rea-
sons stated by him after the first question as follows:

"I again decline to answer the questions pro-
pounded for the reasons: first, because in answering the
questions I would be compelled to disclose confidential
communications and knowledge received as such from
my client, Mrs. Catherine Linze, who is now dead; sec-
ond, because the information sought from me is in-
tended to be used or may be used in a proceeding against

me now pending in the probate court of the city of St. Louis, in which proceeding, I am charged with having embezzled or concealed the securities mentioned in the question, and other property belonging to the estate of Catherine Linze, deceased; third, because the questions propounded to me are incompetent, irrelevant and immaterial to any issue involved in the case in which these depositions are taken; fourth, because I dispute the authority on the part of Mr. J. Hugo Grimm, to put those questions to me, as I have been informed by the chief counsel of the St. Louis Trust Company, A. C. Stewart, the executor of the estate of Catherine Linze, deceased, Mr. Stewart having stated to me that the position which I took in refusing to disclose confidential communications and knowledge coming to me from Mrs. Linze during her lifetime was absolutely impregnable. That conversation of Mr. Stewart occurred prior to the taking of those depositions, and after the affidavit by Henry H. Linze upon which this proceeding is founded had been filed in the probate court, at the office of the said St. Louis Trust Company, where I had been requested to call by said Mr. A. C. Stewart, and in which conversation the relations between Mrs. Catherine Linze, deceased, and her husband, Henry H. Linze, were fully discussed by Mr. Stewart and myself. When I told Mr. Stewart that all the knowledge and information I had about Mrs. Linze's affairs or securities or investments had come to me as her counsel, he said I was pursuing the only proper course in declining to give him or anybody else information about it."

Counsel for the executor then asked the witness:

"Q. Do you mean by this second reason you give, that if you answered this question your answer would tend in anywise to incriminate you?

"Mr. Reynolds, counsel for the defendant: I object to that question as one that the witness can not be compelled to answer. The protection of the Constitution of this State and of the United States extends to the

witness giving any testimony that may even lead up to the establishment of any facts in a case against him where the charge against him is criminal or in the nature of a criminal charge.

"A.    I decline to answer that question because it is extremely improper, and also for the reasons stated by counsel."

It having appeared, from an examination of F. N. Eckerle as a witness in the proceeding against Gfeller, that the latter had given him a large envelope full of documents of some kind, and directed him to take the same to Germany, which Eckerle did, the witness was also asked the following questions, which he declined to answer for the reasons set out after each question:

"Q.    23.    What papers did you deliver to Frederick N. Eckerle just prior to his leaving for Europe in January, 1902?

"Mr. Reynolds:    I object to the question as irrelevant and immaterial to any issue in this case, and because it is an improper question

"A.    I decline to answer that question for the reason that the question as put, and the information sought to be elicited thereby, is intended to be used against me, or may be used against me in the proceeding now pending against me in the probate court of the city of St. Louis, heretofore referred to, and would also involve the disclosure of affairs of some of my clients, knowledge of which came to me in a professional capacity.

"Q.    24.    Give the names of those clients?    A. I decline to do so.

"Q.    25.    Were there any of the books, stocks, or securities, which belonged to Mrs. Linze during her lifetime, among the papers which you handed Mr. Eckerle just prior to his going to Europe in January, 1902?

"Mr. Reynolds:    I object to the question because it assumes that he did hand papers to Eckerle when the witness has declined to answer whether he did or did

not, and this is an indirect way of obtaining the same information and for the reason before given, I object to and advise the witness not to answer it.

"The witness: I decline to answer for the reasons last given by myself and Mr. Reynolds.

"Mr. Grimm: I request you to rule whether the witness must answer questions 22, 23 and 24, being the three immediately preceding this one or not?

"The Notary: I believe the questions are perfectly proper and that the witness should answer the same, and I direct the witness to answer the questions.

"The witness: I decline to answer for the reasons already given by myself and Mr. Reynolds."

The notary ruled that the questions were relevant to the inquiry and ordered the witness to answer them, and upon his persisting in his refusal so to do, committed him for contempt, and this action of the notary was at once followed by the petition for writ of habeas corpus.

From the deposition of Gfeller it appears that he had represented Mrs. Linze during the last few years of her life, as her attorney, and had charge of her securities, and that he also was the attorney for Mr. Eckerle. When he first was asked when he had last seen the St. Louis Brewing Association bonds, Gfeller declined to answer, for two reasons. First, "because, the disclosure of professional secrets;" secondly, "because I ought not to be called upon to testify in this case, as Mr. Eckerle, against whom this proceeding is pending, is my client." Gfeller's deposition shows that both Mrs. Linze and Eckerle had been his clients for a number of years before Mrs. Linze's death, on November 10, 1900.

It is contended by the petitioner that the probate court was without jurisdiction in the proceeding against Eckerle, hence, the notary public was without authority to commit him for contempt for refusing to answer questions. This contention is based upon the fact that

the statute providing for the discovery of assets (sec.
74, R. S. 1899) requires as preliminary thereto that the
executor or administrator of, or some person *interested*
in the estate, shall file an affidavit in the proper court,
stating that the affiant has good cause to believe and does
believe that some certain person has concealed or em-
bezzled or is otherwise wrongfully withholding certain
personal property belonging to the estate, and that
H. H. Linze, who made the affidavit, although the sur-
viving husband of the testatrix, yet as they never had
any children, and she gave him nothing by her will
which was duly admitted to probate, he was not inter-
·ested in the estate, and the court was without jurisdic-
tion to issue the citation. This position is, we think,
untenable.

In the first place, the probate court, by the terms
of the statute under discussion, has authority to cite
the person charged, and to require him to answer inter-
rogatories after the filing of an affidavit of the executor
or administrator or "other person interested in any
estate." It made the citation in the instance under
review upon the affidavit of Mr. Linze, husband of the
deceased. The orders in that behalf amount to a decis-
ion by the probate court that he is interested in the
estate. [Eckerle v. Wood, 95 Mo. App. 378.] And
whether the decision of that fact by the probate court
be right or wrong, it can not properly be reviewed in
this proceeding.

In the second place, even if the question as to
whether or not H. H. Linze had sufficient interest in the
estate to warrant his making the affidavit, as the hus-
band of the testatrix, there being no children of their
marriage, was under the statute (sec. 2938, R. S. 1899)
entitled to one-half of her estate, he clearly had sufficient
interest in it to authorize him to make the affidavit.

It is said that the proceeding in the probate court
is not a suit within the purview of section 2877, Revised
Statutes 1899, which provides for taking of depositions

in a suit pending; that sections 2637 and 2638, Revised Statutes 1899, provide that a defendant in a criminal proceeding can not be called to testify by the prosecutor and is only competent as a witness when he offers himself as such.

But that was not a proceeding against the petitioner, but against Eckerle, and, certainly as to him, it is no concern of the petitioner whether it be a proceeding criminal in its character or not; it is "a suit pending" within the meaning of the law for taking of depositions" (Eckerle v. Wood, supra), in which the notary public had the right and authority to require the petitioner to answer all legal and proper questions. The case of Gordon v. Eans, 97 Mo. 587, relied upon by the petitioner, was a proceeding under the statute by an administrator of an estate against the widow of the deceased to recover certain assets of the estate, and it was said by the court, "that the sole question was, was the defendant guilty of embezzlement, that is, had she fraudulently appropriated, to her own use, money or property entrusted to her care by another? . . . This proceeding, it must be remembered, is quasi-criminal in its nature, its object and purpose being to discover and compel the surrender of property, so fraudulently misappropriated, to the party having a right thereto."

But notwithstanding these observations the court held that the probate court had jurisdiction for the sole purpose of ascertaining the guilt or innocence of the defendant of the embezzlement charged.

It is perfectly clear that the citation issued in the case against Eckerle was not void, but at most only void as to the charge of embezzlement, which charge if thought necessary may at any time be abandoned or the citation amended by leave of court by striking out that charge before the trial, and thus relieve the case of any question or doubt as to the jurisdiction of the court over it.

In the Matter of Charles Green, 86 Mo. App. 216,

Green, who had been administrator of an estate, was proceeded against by the administratrix *de bonis non* of the estate under section 74, Revised Statutes 1899, by suing out of the probate court of St. Louis county a citation against him, and upon his appearance thereto there was propounded to him the following interrogatory: "Did you not conceal, embezzle or otherwise wrongfully withhold said goods, chattels, moneys, books, papers and evidence of indebtedness from the estate of the deceased?" The court said:

"The interrogatories propounded to Green are in groups of three or four questions, and in each group he is asked if he has not embezzled or concealed the things described in that group. To all of the interrogatories he has answered denying that he has in his possession or under his control, or that he has embezzled or concealed any of the assets mentioned in the interrogatories belonging to the estate of Fleming. In this state of the record it is apparent that if he has the assets or any of them, he has embezzled and is secreting them, and that this is the real issue which the jury will have to try. At most the investigation is in that situation where it reasonably appears that the administrator is seeking to convict Green of embezzlement. And though not in name or form a criminal investigation, it is so in character, and the verdict, if for the estate, must be one of conviction. [R. S. 1899, sec. 77.] To make out a case for the estate under the condition in which we find the interrogatories and answers thereto, it will be incumbent on the administrator to adduce evidence proving or tending to prove that Green has embezzled some of the assets described in the interrogatories. From making out such a case against himself, from furnishing a link in a chain of evidence leading to his conviction, and from furnishing any information by which evidence might be obtained tending to convict him, Green is protected by the Constitution, according to all of the authorities, as much so as if he was being prosecuted

under an indictment charging embezzlement of the assets of the estate of Alfred W. Fleming, deceased. He is not in the same situation as a witness in an ordinary civil suit, who, to claim his protection, must first be sworn as a witness, and then when a question is propounded to him, that to answer would criminate or tend to criminate him, must so declare under oath and invoke the protection of the law. But, as before stated, Green's situation as a witness is analogous to' that of a defendant in a criminal suit by indictment or on information. He may or may not testify as he elects. He can not be called by the opposite party as a witness, nor sworn as such, unless he voluntarily offers himself to be sworn. When he refused to be sworn as a witness, he exercised a constitutional right, and is entitled to his discharge under the writ of habeas corpus. [Ex parte Lange, 85 U. S. 163; People, etc., v. Kelly, 24 N. Y. 74; People, etc., v. Liscomb, 60 N. Y. 559; In re Dill, 32 Kan. 668.] ''

But, as has been said, this is not a proceeding against Gfeller under the statute in which he declined to be sworn to answer interrogatories propounded to him, but a proceeding under the same statute against another person wherein he, Gfeller, was sworn as a witness to the end of having his deposition taken in that suit, and his refusal to answer the questions propounded to him as hereinbefore set forth.

By questions, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, and 14 the witness was simply asked whether he had ever seen the sureties therein mentioned.

Question 2 was as to what he had done with St. Louis Brewing Association bonds numbered 4450 to 4468, inclusive. To this question the witness replied:

''I decline to answer that question for two reasons: First, because the disclosure of professional secrets, and, secondly, because I ought not to be called upon to testify in this case as Mr. Eckerle against whom this proceeding is pending is my client.''

''Mr. Reynolds: I object to the question because

it is irrelevant and immaterial to any issue in the citation against Eckerle. I make the further objection on behalf of the witness that the bonds inquired of are the bonds supposed to be referred to in the citation in the probate court of the city of St. Louis against the witness Alfred Gfeller, in which proceeding said Gfeller is charged with having received or embezzled bonds of this brewing company, and he can not be compelled in this case, or in any case, to give testimony concerning or bearing upon that issue.''

The grounds for the refusal by the witness himself, as well also as those given by his counsel for his refusal to answer the question, were no justification or excuse for not answering the questions. If his professional secrets were obtained from Mrs. Linze as he stated they were, the privilege belonged to her, and after her death to the St. Louis Trust Company, her executor, at whose instance that suit was being prosecuted.

Our statute places attorneys and physicians upon substantially the same grounds with respect to privileged communications, and it was held in Thompson v. Ish, 99 Mo. 160, that the protection afforded by the statute against calling a physician to give evidence of the information acquired in a professional character from his patient, may be waived by the latter or those representing him after his death, for the purpose of protecting rights acquired under him. The court said:

''Notwithstanding our statute provides for no exception, still it deals with a privilege, and it must be taken as established law that the privilege may be waived by the patient; and we have held that it may be waived by the representative, and, in this, our ruling accords with that of the Supreme Court of Michigan under a like statute. If the patient may waive this right or privilege for the purpose of protecting his rights in a litigated cause, we see no substantial reason why it may not be done by those who represent him

after his death, for the purpose of protecting rights acquired under him.

"Some light may be thrown upon this question by analogy from the rules of law applied to confidential communications between client and attorney. Such communications, it is held in Russell v. Jackson, 9 Hare 390, must not be revealed in cases where the rights and interests of a client, or those claiming under him, come in conflict with the rights and interests of third persons; but this rule, it is held, does not apply to cases of testamentary disposition of property by the client. The disclosure in such cases, it is considered, can affect no right or interest of the client, and is therefore not within the reason of the rule. Taylor says: 'In stating that the privilege does not terminate with the death of the client, care must be taken to distinguish between cases where disputes arise between the client's representative and strangers, and those in which both of the litigating parties claim under the client.' As to the latter class of cases he says, 'it would be obviously unjust to determine that the privilege should belong to one claimant rather than the other.' [1 Taylor on Ev., sec. 928, p. 603. See, also, Blackburn v. Crawfords, 3 Wall. 175; Scott v. Harris, 113 Ill. 454.]"

Winters v. Winters, 102 Iowa 53, was a will contest, and it was therein held that the attending physician upon the testator in his last sickness might, on the probate of the will, be examined by the contesting heirs at law, as well as by the devisee or the executor, in respect to information acquired in his professional capacity, though the Iowa Code, section 3643, prohibits the disclosure of such information unless the party for whose benefit the prohibition is made waives his rights thereunder.

While there was no express waiver by the executor in this case with respect to the communication between the petitioner and his client, Mrs. Linze, or anything that he may have learned from her in his capacity as

attorney for her in regard to the bonds in question, there could have been no stronger evidence of such waiver than to proceed against him as it did under the statute for discovery and production.

Nor could the petitioner decline to answer the question upon the ground of privilege growing out of the relations between himself and his client Mrs. Linze, even if his right to do so was not waived by the executor (which we do not concede), for no professional confidence would have been violated in telling where he last saw these bonds or in answering any of the other questions propounded to him. As was said in Shaughnessy v. Fogg, 15 La. 330, "If an attorney at law were not permitted to disclose who was his client, and what sums of money he had received or disbursed on his account, it would give rise to great frauds. If the attorney may be interrogated as to who is his client, he may also be asked through whose agency, or in what manner, *and* at what time, he was retained. [1 Greenleaf's Evidence, sec. 245; 2 Starkie on Evidence, 398; 6 N. S. 284; 4 La. 500; 11 Wheat. 280; 3 Rob. 204; 3 Rob. 230.]"

There are many transactions between attorney and client that have no element of confidence in them, with respect to which the attorney is competent to testify. For instance, he may prove his client's handwriting; may prove what money was collected by him, when paid over, and to whom paid. [Johnson v. Patterson, 13 Tenn. 626. See, also, Turner v. Warren, 160 Pa. St. 336.]

And it would have been competent for plaintiff to have asked the petitioner what property of Mrs. Linze he did have and what disposition he had made of the same (State ex rel. Hardy v. Gleason, 19 Ore. 159, and authorities cited) and it must necessarily follow that it was entirely proper to ask him when he last saw her St. Louis Brewing Association bonds, which were numbered 4450 to 4466, inclusive.

As to that part of the objection by the petitioner

to answering the question predicated on the fact that Eckerle was his client, it offers but a flimsy pretext for refusing to do so, and places the witness in the unenviable position of representing two clients with respect to conflicting interests at the same time, that is to say, the interest of Mrs. Linze represented by her executor, and the interest of Eckerle. Nor could he after having been the attorney of Mrs. Linze and as such come into the possession of facts in regard to her business and property that were not privileged, thereafter become the attorney of Eckerle, and by reason thereof seal his mouth as to matters that were not privileged as the attorney of Mrs. Linze.

As to whether the question was irrelevant or immaterial was for the decision of the notary public before whom the evidence was being taken. [Ex parte McKee, 18 Mo. 599.]

Among other reasons assigned by the petitioner for refusing to answer questions numebered 1 and 22 inclusive was the following: "I again decline to answer the questions propounded, for the reasons, because the information sought from me is intended to be used, or may be used in a proceeding against me now pending in the probate court of the city of St. Louis, in which proceeding, I am charged with having embezzled or concealed the securities mentioned in the question, and other property belonging to the estate of Catharine Linze, deceased." It will be observed that this objection to answering the questions is not based upon the ground that to answer them would incriminate or tend to incriminate the witness, but solely upon the ground that it might be used against him in a proceeding pending against him in the probate court for embezzlement. In this connection the petitioner was asked by executor if he meant by declining to answer the question that his answer would tend in anywise to incriminate him, when the following occurred:

"Mr. Reynolds, counsel for the defendant: I

object to that question as one that the witness can not be compelled to answer.   The protection of the Constitution of this State and of the United States extends to the witness giving any testimony that may even lead up to the establishment of any facts in a case against him where the charge against him is criminal or in the nature of a criminal charge.

"A.   I decline to answer that question because it is extremely improper, and also for the reasons stated by counsel."

The questions numbered 23, 24 and 25, and the refusal for answering same proceeded upon the same lines.

It will be observed that the grounds upon which the petitioner refused to answer the questions now under consideration were not that to answer them would be to incriminate him, or to furnish evidence against himself in a criminal prosecution then pending or about to be instituted against him, but upon the ground that the Constitution of this State and of the United States protect him from giving any testimony that may even lead up to the establishment of any facts in a case against him where the charge against him is criminal or in the nature of a criminal charge.   It is apparent that both the questions propounded to the witness and the reasons assigned by him for refusing to answer them, furnished no justification or excuse for so doing.   They were with respect to matters, the answers to which in no way tended to incriminate the witness, nor was his refusal to answer the questions placed upon that ground.

The petitioner will be remanded to the custody of the sheriff of the city of St. Louis and required to answer the questions.

All concur.