Argued June 28; defendant disbarred July 6, 1939

IN RE ILLIDGE

(91 P. (2d) 1100)

*W. A. Illidge*, of Portland, in pro. per.

*John D. Galey* and *C. A. Beckman*, both of Portland, for the Oregon State Bar.

KELLY, J. On July 18, 1938, the Oregon State Bar filed with its Board of Governors a complaint charging W. A. Illidge, a member of the Oregon State Bar with unprofessional conduct.

There are four specifications of misconduct:

(1) "In a suit in equity in the circuit court of the state of Oregon for Multnomah County, entitled 'Frank E. Heffernan vs. Susan Baldwin and W. A. Illidge' Clerk No. 124-771, the said W. A. Illidge was sworn and testified as a witness in a deposition taken before the Honorable Louis P. Hewitt, Presiding Judge of the above mentioned court, on or about February 5, 1938, at which time and place the said W. A. Illidge testified among other things, that the said Sarah Baldwin then had a home in Philadelphia, Pennsylvania; that she was personally present in the city of Portland, Oregon, on or about December 25, 1935, and remained in that city for about a month, at which time she looked at that certain real property in the city of Portland, Oregon, known and described as Lots 13, 14, 15 and 16, in Block 1, Irene Heights; that during or about the month of April, 1936, the said Sarah Baldwin purchased said real estate in a transaction in which he, the said W. A. Illidge, represented her, the said Sarah Baldwin; that she purchased said real estate for the purpose of improving the same and selling it; that she paid for said real estate by a check or checks drawn upon the United States National Bank, Portland, Oregon, which she herself signed in blank during the time she was personally present in Portland, Oregon; that at that time she signed two or three dozen checks in blank, against an account in her name in the said United States National Bank, in which she had deposited $10,500 or more; that he, the said W. A. Illidge, was personally present with the said Sarah Baldwin in the early part of the year 1936, when she deposited in said bank the sum of $10,500 in currency; that the said Sarah Baldwin was personally present in the city of Portland, Oregon, during the month of December 1936; that be-

tween that time and February 5, 1938, he, the said W. A. Illidge, had received occasional letters from the said Sarah Baldwin, the last of which had been received by him during or about the month of November 1937; that during or about the month of April 1936, the said Sarah Baldwin was visiting in Beloit, Wisconsin; that during the month of February 1938, the said Sarah Baldwin was in Philadelphia, Pennsylvania; that the said Sarah Baldwin was an aunt of the said Susan Illidge; that the said Susan Illidge had received a Christmas card from the said Sarah Baldwin during the Christmas season of the year, 1937; that at that time the said Sarah Baldwin was in Reading, Pennsylvania.

That each and all of said testimonial statements of the said W. A. Illidge were wilfully and knowingly false.''

(2) ''In a proceeding in interpleader in the Circuit Court of the State of Oregon, for the County of Multnomah, entitled 'The First National Bank of Portland (Oregon), a National Banking Association, Plaintiff, vs. W. A. Illidge, Susan Illidge, Sarah Baldwin, Allison H. Dean, and Martin T. Pratt, as Sheriff of Multnomah County, Oregon, defendants,' Clerk No. 128076, the said W. A. Illidge was sworn and testified as a witness in a deposition taken on or about April 6, 1938, before the Honorable Robert Tucker, Presiding Judge of said court.

At said time and place the said W. A. Illidge testified among other things that he had sent a memorandum of assignment, dated September 8, 1937, in words substantially as follows, to-wit:

'For value received I hereby assign the above mentioned account to Susan Illidge',

typewritten upon a letter from the First National Bank of Portland (Oregon) to Sarah Baldwin for her signature, and that she signed it and returned it to him subsequently to September 8, 1937; that said assignment was returned with a letter written by said Sarah Baldwin, addressed to the said Susan Illidge; that he had

had correspondence with the said Sarah Baldwin within a reasonable period of time preceding the date of said deposition, to-wit: April 26, 1938; that her last letter to him was postmarked Lebanon, Pennsylvania.

That each and all of said testimonial statements of the said W. A. Illidge were willfully and knowingly false."

(3) "In a proceeding in interpleader in the Circuit Court of the State of Oregon for the County of Multnomah, entitled 'The First National Bank of Portland (Oregon), plaintiff, vs. W. A. Illidge, et al., defendants,' Clerk's No. 128-076, the said W. A. Illidge appeared as the attorney of record for the said Susan Illidge, who was one of the defendants therein. That in a deposition taken on April 26, 1938, before the Hon. Robert Tucker, Presiding Julge of said court, the said Susan Illidge was sworn and testified as a witness and thereupon testified among other things, that she, the said Susan Illidge, did on or about July 30, 1937, sign a certain instrument in writing with the name of Sarah Baldwin, by the express direction of said Sarah Baldwin, in words as follows, to-wit:

'Portland, Oregon
July 28, 1937

First National Bank
Fifth and Stark Streets
Portland, Oregon.

Attention: Commercial Department.

Gentlemen:

Please place on record the enclosed assignment of $1650 held on deposit by you through attachment proceedings instituted by Allison H. Dean on October 10, 1935, and inform me when you have done so.

Sarah Baldwin
3401 N. E. 35 Place.'

that said Sarah Baldwin was an aunt of said Susan Illidge; that she was at that time, to-wit: in July 1937, in the eastern part of the United States; that she was at

that time seventy-six years old; that she was present in the City of Portland, Oregon, in the year 1936, after which she went to the State of California; that she was at that time planning to enter an old Peoples' home; that she, the said Susan Illidge, had, subsequently to December 1936, received a letter from the said Sarah Baldwin; that she, the said Susan Illidge, had during the year 1936, signed certain checks with the name of Sarah Baldwin at her express direction and in her presence; that the said Sarah Baldwin had written a letter to the said Susan Illidge two or three months before April 26, 1938, from Reading or Lebanon, Pennsylvania; that she, the said Susan Illidge had sent an instrument in writing in a letter to Sarah Baldwin, and had received the same from her again in a letter from the said Sarah Baldwin during the year 1937 or 1938.

That said testimony of said Susan Illidge was willfully and knowingly false. That the said W. A. Illidge at the said time and place well knew the same to be false, and induced or permitted said false testimony to be given.''

(4) ''That on or about July 29, 1937, the said W. A. Illidge and the said Susan Illidge, his wife, made, executed and delivered to the First National Bank of Portland (Oregon) a certain instrument in writing, in words and figures as follows, to-wit:

'Assignment

'For value received I hereby assign, set over and transfer to Sarah Baldwin of Portland, Oregon, all my right, title and interest in and to Sixteen Hundred Fifty Dollars ($1650) now on deposit in the First National Bank of Portland, Oregon, and being held by said bank under writ of attachment issued October 10, 1935 by the Circuit Court of the State of Oregon for the County of Multnomah, in case number 119907, wherein Allison H. Dean is plaintiff.

| | |
|---|---|
| Portland, Oregon | W. A. Illidge |
| July 29, 1937 | Susan Illidge' |

On or about July 29, 1937, the said W. A. Illidge induced the signing by his said wife, the said Susan Illidge, in the name of Sarah Baldwin, of an instrument in writing in words and figures substantially as follows:

"Portland, Oregon
July 29, 1937

First National Bank
Fifth and Stark Streets
Portland, Oregon

Attention: Commercial Department.

Gentlemen:

Please place on record the enclosed assignment of $1650, held on deposit by you through attachment proceedings instituted by Allison H. Dean on October 10, 1935, and inform me when you have done so.

Sarah Baldwin
3401 N. E. 35 Place.'

That on or about September 8, 1937, the said W. A. Illidge induced the signing by the said Susan Illidge, his wife, in the name of Sarah Baldwin, of an instrument in writing substantially as follows, to-wit:

'September 8th, 1937

'For value received I hereby assign the above mentioned account to Susan Illidge.

Sarah Baldwin.'

That subsequent to November 3, 1937, the said W. A. Illidge stated to Mr. C. E. Zollinger, who is an attorney-at-law in the City of Portland, Multnomah County, Oregon, and who at that time was attorney for the plaintiff in a proceeding in interpleader entitled 'The First National Bank of Portland (Oregon) vs. W. A. Illidge, Susan Illidge, et al, Clerk's Number 128-076, in which proceeding the said W. A. Illidge appeared as attorney of record for the defendant Susan Illidge, that the said Sarah Baldwin was at that time in Honolulu; that on or about September 8, 1937, she had reassigned

to Susan Illidge the bank account referred to in the instrument in writing hereinbefore mentioned, dated July 29, 1937.

That each of the said acts and statement of the said W. A. Illidge, to the effect that the said Sarah Baldwin was a living person, were willfully and knowingly false.

That the conduct as aforesaid of the said W. A. Illidge, was and is unethical and unlawful in violation of his obligation and duties as an attorney-at-law, and in violation of the statutes of the State of Oregon, and the rules of professional conduct of the Oregon State Bar, and it constitutes such conduct that if the said W. A. Illidge were now applying for admission to the Bar, his application therefor should be denied.''

Said suit in equity was instituted by Frank E. Heffernan against defendant W. A. Illidge and Susan Baldwin to foreclose a mechanic's lien. The proceeding in interpleader was instituted because of the service of a notice of garnishment upon said First National Bank in an action instituted by Allison H. Dean against defendant W. A. Illidge and his wife to recover a real estate commission, and because the claim made by Illidge that a joint deposit in said bank in the name of Mr. and Mrs. Illidge had been assigned to Sarah Baldwin.

Obviously the pivotal question is whether, at the time of the transfer of the above described real property and the transactions with the banks mentioned, Sarah Baldwin was merely the name of a fictitious person or was that of a living person, who actually did the things that Mr. Illidge said she did.

These transactions occurred during the year 1936 and 1937. In this disbarment proceeding Mrs. Illidge testified that the Sarah Baldwin, who made the $10,500

deposit aforesaid, was the widow of John Baldwin. Both Mr. Illidge and his wife testified that said Sarah Baldwin was Mrs. Illidge's aunt; that during the Christmas season of 1935, this person visited at the home of Mr. and Mrs. Illidge, and in April, 1936, accompanied Mr. and Mrs. Illidge to the United States National Bank of Portland and there made the deposit mentioned, in the sum of $10,500. Mrs. Illidge testified that after making said deposit they took her aunt home; and they the Illidges then went to the offices of the Title & Trust Company to complete the purchase of the Irene Heights property.

Both Mr. Illidge and his wife testified that they received a letter, known to this record as defendants' exhibit No. 14, from this person whom they claimed to be Mrs. Illidge's aunt dated February 25, 1938, wherein said aunt declined to permit Mr. Illidge to appear in the suit of Mr. Heffernan.

Mr. Thomas F. Dunn, assistant cashier of the United States National Bank, identified Mrs. Illidge as the person who made the deposit mentioned.

Mr. Stanley McDonald, a handwriting expert, testified that in his opinion exhibit No. 14 was written by the same person who had written certain other writings admittedly written by Mrs. Illidge.

Mrs. Loretta C. Batdorf of Lebanon, Pennsylvania, testified, in a deposition, that she was acquainted with Sarah Baldwin, known to her as Sallie Baldwin, the aunt of Mrs. Illidge, and that said Sarah Baldwin never had been in Portland, Oregon.

Mr. M. L. Baldwin, residing at 121 East Oak street, Palmyra, Pennsylvania, being a son of Sarah Baldwin, the said aunt of Mrs. Illidge, testified that his mother, the said Sarah Baldwin, died in August, 1926, and that

his father John Baldwin died in February, 1914; that both his parents were buried in Gravel Hill Cemetery north of Palmyra, Pennsylvania, and that his mother never was in Portland, Oregon.

Mr. Illidge presents four assignments of error.

■ The first two challenge the propriety of requiring him to answer the question wherein he was asked to state the place of residence of Sarah Baldwin. This occurred while the deposition of Illidge was being taken in the case of *Frank E. Heffernan vs. Sarah Baldwin et al.,* State Bar Exhibit F. He claims that he received that information in the course of his employment as her attorney and that it was privileged. Bearing in mind that the purpose of the question was to determine whether Sarah Baldwin actually existed; and, if so, how jurisdiction could be obtained in the litigation wherein the question was propounded, we think that no error was committed by requiring Mr. Illidge to answer.

*Schwarz v. Robinson,* 113 N. Y. S. 995, 129 App. Div. 404; *United States v. Lee,* 107 Fed. 702; *Martin v. Anderson,* 21 Ga. 301; *Brown v. Payson,* 6 N. H. 443; *Ex parte Gfeller,* 178 Mo. 248, 77 S. W. 552; *Ex parte Campbell,* 5 Ch. App. 703, 23 L. T. N. S. 289; *Alden v. Goddard,* 73 Me. 345; *Bursill v. Tanner,* 16 Q. B. Div. 1; *Cox v. Bockett,* 18 C. B. (N. S.) 239, 34 L. J. N. S. 125, 11 L. T. 629; *Markevich v. Royal Ins. Co.,* 147 N. Y. S. 1004, 162 App. Div. 640; *In re Malcom,* 113 N. Y. S. 666, 129 App. Div. 226; *Corbett v. Gibson,* 25 Sup. C. Rep. 49, (N. Y.) 18 Hun. 49; *Corbett v. De Comeau,* 45 N. Y. Super. Ct. 637; *Post v. Schneider,* 59 Hun 619, 13 N. Y. S. 396; *Ninety-nine Plaintiffs v. Vanderbilt,* 11 N. Y. Super 632, 1 Abb. Pr. 193, 10 How. Pr. 324.

In some of the foregoing cases, the question whether an attorney should be required to divulge the address

of a client was presented by means of an application for an order directing the attorney to furnish such information; and in others, as in the case at bar, by asking for such information while the attorney was on the witness stand.

In England, the former procedure is authorized by statute. [Section 7, Common Law Procedure Act 1854.]

In the United States, it is generally held to be within the inherent power of the court, in proper cases, to require an attorney to furnish such information. There are circumstances which will justify a refusal on the part of an attorney to give such information. *Ex parte Schneider,* [Mo. App.] 294 S. W. 736 [in this case the client was not a party.] *Walton v. Fairchild,* 4 N. Y. S. 522, *In re Trainor,* 130 N. Y. S. 682, 146 App. Div. 117; *Levy v. Coy, Hunt & Co.,* 117 N. Y. S. 949, 64 Misc. 39. [In these three cases last cited, the litigation had terminated.] No such circumstance attended the litigation out of which this proceeding has arisen.

The case of *People ex rel. Vogelstein v. Warden of County Jail,* 270 N. Y. S. 362, 150 Misc. 714, affirmed in 271 N. Y. S. 1059, 242 App. Div. 611, without opinion, is instructive. There, the attorney declined to give the name and address of his alleged client.

We quote from Mr. Justice Shientag's opinion in that case:

"(2) The attorney-client privilege, is not one which is guaranteed by the Constitution. It is a statutory provision which embodies in substance the common-law rule. It is subject to the will and control of the Legislature. The same body which confers the privilege may regulate it, may modify it, if indeed it may not abolish it altogether.

Section 353 of the Civil Practice Act provides that: 'An attorney or counselor at law shall not be allowed to disclose a communication, made by his client to him, or his advice given thereon, in the course of his professional employment, nor shall any clerk, stenographer or other person employed by such attorney or counselor be allowed to disclose any such communication or advice given thereon.'

The question is whether this statutory privilege applies to the situation here disclosed.

(3) While the statute does not expressly provide that the communication shall be confidential, the courts have always so interpreted it. The privilege 'rests not only upon the professional character of the employment, but also upon the confidential nature of the communication'. Baumann v. Steingester, 213 N. Y. 328, 333, 107 N. E. 578, 580, Ann. Cas. 1916C, 1071; People v. Buchanan, 145 N. Y. 1, 26, 39 N. E. 846; Avery v. Lee, 117 App. Div. 244, 247, 102 N. Y. S. 12.

The privilege is one of ancient origin. It is recognized in the civil law and finds its place in the Codes of continental countries. Radin, The Privilege of Confidential Communication between Lawyer and Client, 16 Cal. Law, Rev. 487. In England it goes back to the reign of Elizabeth. Originally its basis was the honor of the attorney rather than the apprehension of his client. Under the original theory the privilege did not exempt the client himself. It could be waived by the attorney, since only his honor was involved. This doctrine was subsequently repudiated entirely. The new theory 'looked to the necessity of providing subjectively for the client's freedom of apprehension in consulting his legal adviser and proposed to assure this by removing the risk of disclosure by the attorney even at the hands of the law.' Wigmore on Evidence, § 2290.

Under the new theory it was the privilege of the client; the attorney could not waive it, only the client could do so. Not alone were the attorney's lips sealed, but the client himself could not be compelled to testify to the confidence. Originally the privilege was limited

to communications received since the beginning of the litigation and for the purposes of the litigation only. Gradually the privilege was extended to all communications made by a client in confidence to his attorney, whether they related to any suit then pending or contemplated or to other matters proper for professional advice. The seal of secrecy was placed not alone on communications made by the client, but on the advice given by the attorney. Bacon v. Frisbie, 80 N. Y. 394, 36 Am. Rep. 627; Root v. Wright, 84 N. Y. 72, 38 Am. Rep. 495.

While its soundness has not been unchallenged, the privilege is so ingrained in our law, that for centuries it has been steadily upheld. Bentham, Rationale of Judicial Evidence, quoted in Wigmore on Evidence, § 2991; Lord Langdale in Flight v. Robinson, 8 Beav. 22, 36.

The policy of the privilege has been the subject of much discussion. It is summed up by Wigmore as follows: 'In order to promote freedom of consultation of legal advisers by clients, the apprehension of compelled disclosure by the legal advisers must be removed; and hence the law must prohibit such disclosure except on the client's consent.' Wigmore on Evidence, § 2991.

Phillips, an early writer on the law of Evidence, said: 'The expediency of this rule must depend not on the impropriety of violating the confidence reposed, but on a consideration that the collateral inconvenience which would ensue if no such confidence were reposed would preponderate over the direct mischief produced by a chance of the failure of justice resulting from the exclusion of the evidence.' Phillips on Evidence, vol. 1, p. 134.

██ A review of the decisions clearly indicates that it was not the purpose of the privilege to shield guilt. Its primary object was to secure the orderly administration of justice by insuring frank revelation by the client to the attorney without fear of a forced disclosure; in other words, to promote freedom of consultation. To be sure the exercise of the privilege may at

times result in concealing the truth and in allowing the guilty to escape. That is an evil, however, which is considered to be outweighed by the benefit which results to the administration of justice generally.

There is nothing in the books to show that the privilege was to extend to the fact of the retention of counsel. No point is made that the employment of counsel should be shrouded with secrecy. The retention of counsel was to call the privilege into operation. The privilege itself was to extend only to communications between a client and an attorney who had been retained. The name or identity of the client was not the confidence which the privilege was designed to protect; the statements of the client for the purpose of seeking advice from his counsel were the disclosures which were to be kept secret. As Lord Esher, M. R. succinctly put it: 'The client does not consult the solicitor with a view to obtaining his professional advice as to whether he shall be his solicitor or not.' Bursill v. Tanner, L. R. 16 Q. B. D. 1, 4. The mere fact of the engagement of counsel is out of the rule because the privilege and duty of being silent do not arise until that fact is ascertained. 'What a solicitor is privileged from disclosing' said James, L. J. 'is that which is communicated to him sub sigillo confessionis—that is to say, some fact which the client communicates to the solicitor for the purpose of obtaining the solicitor's professional advice and assistance; the principle being, that such communications ought to be privileged, because otherwise a man would be deterred from fully disclosing his case, so as to obtain proper professional aid in a matter in which he is likely to be thrown into litigation.' Ex parte Campbell, L. R. 5 Ch. App. 703, 705.

In Levy v. Pope, Moody & Malkin, 410, the Attorney General, in order to prove the real defendant, called the attorney who conducted the defense and asked him who employed him to defend the case, Parke, J., ruled: 'He may be asked between whom the relation exists, to show who is the real defendant, in order that his acts and declarations may be admitted.'

Where the privilege is claimed, the attorney must name an actual client in order to prove the existence of the relationship; otherwise, no lawyer could ever be questioned as to any fact, since he might always claim that he had learned it from a client whose very existence he need not show.

The case of United States v. Lee (C. C.) 107 F. 702, would seem to be directly in point. There a defendant, admitted to bail, could not be found and on investigation by the grand jury it appeared that his counsel was not retained by the accused but by some person acting for him or in his interest. The court held that counsel would be compelled to disclose the name of such person. 'The court has a right to know that the client whose secret is treasured is actual flesh and blood, and demand his identification, for the purpose, at least, of testing the statement which has been made by the attorney who places before him the shield of this privilege. The declination of the answer because a man imparted the desired information who stood in the relation of a client justifies the testing of questions relating to the client's actual identity and existence.' United States v. Lee, supra, page 704 of 107 F.

In an early case, Chief Justice Doe of New Hampshire held: 'The objection, that evidence is a disclosure of a privileged communication between attorney and client, is founded on the proof of the fact that the relation of attorney and client existed. The existence of that relation is not a privileged communication.' Harriman v. Jones, 58 N. H. 328.

'It is only a communication made because of, and in the course of, the confidential relation of client and attorney, which is privileged. A mere request by one to an attorney to become and act as his attorney, is not made because of such relation, but for the purpose of creating it.' Eickman v. Troll, 29 Minn. 124, 125, 12 N. W. 347.

The great weight of authority in England and in this country is that the client's identity does not come within the scope of the privilege.''

Here the learned jurist cites the following authorities: *Martin v. Anderson,* supra; *Fowler v. Sheridan,* 157 Ga. 271, 121 S. E. 308; *Alden v. Goddard,* supra; *Leindecker v. Waldron,* 52 Ill. 283; *Richards v. Richards,* 64 Misc. 285, 119 N. Y. S. 81, affirmed in 143 App. Div. 906, 127 N. Y. S. 1141; *Catalog Ass'n v. Eberly's Sons,* 60 App. D. C. 216, 50 F. (2d) 981; *Matter of King v. Ashley,* 96 App. Div. 143, 89 N. Y. S. 482, Aff'd. 179 N. Y. 281, 72 N. E. 106; *Ninety-nine Plaintiffs v. Vanderbilt,* supra; *Arkansas City Bank v. McDowell,* 7 Kan. App. 568, 52 P. 56; *Satterlee v. Bliss,* 36 Cal. 489; *Collins v. Hoffman,* 62 Wash. 278, 113 P. 625, 1913A Ann. Cas. 1; *Shanghnessy v. Fogg,* 15 La. Ann. 330; *Turner's Appeal,* 72 Conn. 305, 44 A. 310; *Mobile & M. Ry. Co. v. Yeates,* 67 Ala. 164; *White v. State,* 86 Ala. 69, 75, 5 So. 674; Wigmore, Evidence, Sec. 2313; Greenleaf, Evidence, Sec. 245; *Chirac v. Reinicker,* 11 Wheat. 280, 6 L. Ed. 474 (semble); *Beamer v. Darling,* 4 Upper Can. Q. B. R. 249; *Parkhurst v. Lowten,* 2 Swanston 194, 201; *Bursill v. Tanner,* (1885) supra; *Gillard v. Bates,* 6 M. & W. 547; *Contra, Ex parte McDonough,* 170 Cal. 230, 149 P. 566, L. R. A. 1916C, 593, Ann. Cas. 1916E, 327.

In citing the McDonough case, Justice Shientag directs attention to the dissenting opinion therein and submits that it represents the correct view.

The case of *Elliott v. United States,* 23 App. D. C. 456, seems to us to be in the same category as the McDonough case.

See Annotation in 114 A. L. R. 1321 on "Disclosure of name, identity, address, occupation, or business of client as violation of attorney-client privilege."

The third assignment urges that there is no competent testimony to sustain the findings, decision and recommendations herein.

■ We think that the testimony of the son of the person whom both Mr. and Mrs. Illidge claimed to be the Sarah Baldwin involved in the transactions in suit is competent testimony. Not only is it competent but it is convincing; and, as stated, it is to the effect that the person Mr. and Mrs. Illidge claimed to be with them in 1936, died in 1926.

It is true that in oral argument Mr. Illidge stated that Sarah Baldwin was the wife of some uncle of his wife other than John Baldwin. The fact that no suggestion of that kind appears in the record prior to the taking of the deposition of M. L. Baldwin; that Mrs. Illidge testified, as stated, that the Sarah Baldwin in question was the widow of her uncle, John Baldwin, convinces us that the statement on oral argument is an afterthought. At any rate, there is absolutely nothing in the record even tending to support it.

Mr. Illidge testified that he first became acquainted with said Sarah Baldwin in July or August, 1920, at which time Mrs. Baldwin was living in Lebanon, Pennsylvania, and when, with his wife, he made a trip East; that when he was introduced to her, Mrs. Baldwin looked him over, turned to Mrs. Illidge and said: ''He looks civilized.'' Mr. Illidge also testified that Mrs. Baldwin had known Mrs. Illidge before that visit. Mr. Illidge testified that a Mr. Dixon Coover married Mrs. Illidge's mother's sister and that in 1920, Mr. Coover lived at 310 Cherry Street in Palmyra, Pennsylvania. Mr. Coover's deposition was taken and appears in the record before us. There is nothing in it nor in any other part of this record to support the suggestion that Mrs. Illidge had an aunt by the name of Sarah Baldwin, upon whom Mr. and Mrs. Illidge had called in 1920 at Lebanon, Pennsylvania, with whom for 15 years there-

after the Illidges had corresponded at more or less irregular intervals, who had visited Mr. and Mrs. Illidge in Portland, Oregon, in 1935 and 1936, and whom Mrs. Illidge had continuously understood to be, and who, Mrs. Illidge positively testified herein, was her uncle John's widow; but who actually was the third Sarah to win a husband among the eleven Baldwin brothers. Something more than a mere suggestion of that kind in argument should have been presented to refute the case made in support of the charges herein.

To accredit the story told by Mrs. Illidge as to the manner in which the deposit of $10,500 was made with the United States National Bank of Portland is to stretch credibility to the breaking point.

Mr. Dunn's testimony to the effect that then and there Mrs. Illidge impersonated a woman named Sarah Baldwin, in our opinion, truthfully reflects the occurrence as it actually transpired.

By the fourth assignment, it is argued that the guilt of the accused is not clearly established and may be deduced only by basing an inference on an inference.

The accused testified that Sarah Baldwin visited at his home during the Christmas season of 1935; that in the early part of 1936, Sarah Baldwin made the deposit above mentioned; that she purchased the Irene Heights property; that she corresponded with Mrs. Illidge, and that she was an aunt of Mrs. Illidge.

■ The record convinces us, not by inference but by the direct testimony of her son, that at the time mentioned, namely, during the winter of 1935-1936, Sarah Baldwin, aunt of Mrs. Illidge, had been dead for more than nine years.

■ Mr. Illidge is not before us confessing that his story about Sarah Baldwin is a fabrication having for

its purpose concealment of his assets to the prejudice of his creditors and promising to make amends and in the future to refrain from such misconduct. On the contrary, throughout all the proceedings in which he has spoken about it, even in his oral argument before the court in the instant case, he has repeated and reiterated that story.

Guided by the record, which is our only recourse, we are convinced that his story is false.

It is an unpleasant duty to disbar an attorney, but the record in this proceeding leaves us no alternative. The defendant is shown to have committed the offenses charged. His misconduct was deliberately planned, it is felonious in its character, has had the effect to embarrass, and was intended to defeat, the orderly administration of justice. These offenses constitute grounds for disbarment: *State ex rel. Grievance Committee v. Woerndle*, 109 Or. 461, 209 P. 604, 220 P. 744; *State ex rel. Joseph v. Mannix*, 133 Or. 329, 288 P. 507, 290 P. 745; Section 32-502, Oregon Code 1930.

The recommendation of the Board of Governors of the Oregon State Bar is approved and it is ordered that defendant, W. A. Illidge, be and he is hereby permanently disbarred.

RAND, C. J., BAILEY and ROSSMAN, JJ., concur.