221 N.J. Super. 187 (1987)
534 A.2d 65
IN THE MATTER OF JOSEPH NACKSON, ESQ., CHARGED WITH CONTEMPT OF COURT, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued October 26, 1987.
Decided November 19, 1987.
*189 Before Judges O'BRIEN, HAVEY and STERN.
Brian J. Neary argued the cause on behalf of appellant.
John Musarra, Senior Assistant Prosecutor, argued the cause on behalf of respondent (Richard C. Hare, Warren County Prosecutor, attorney; John Musarra, of counsel and on the brief).
The opinion of the court was delivered by STERN, J.A.D.
Joseph Lewis Nackson, an attorney admitted to the bar of this state, appeals, on leave granted, from an order of the Law Division directing him to answer questions before a Warren County Grand Jury concerning the whereabouts of his client, a fugitive.[1] Nackson challenges the ability of the grand jury to question an attorney who represents the target of its investigation and claims that questions directed to an attorney concerning the whereabouts of his client are prohibited by the attorney-client *190 privilege. We agree that the order directing Nackson to answer the questions was improper. However, we hold only that in the aggregate of circumstances the claim of privilege addressed to the specific questions asked was improperly denied.

I
In April of 1979, the Warren County Grand Jury indicted Mark Meltzer for unlawful possession of marijuana, N.J.S.A. 24:21-20a(4), and possession of that substance with intent to distribute, N.J.S.A. 24:21-19a(1). While we have been presented with letters between Nackson, on the one hand, and the trial court and prosecutor, on the other, with respect to a date for arraignment, the record does not reflect any entry of a formal appearance. See R. 3:8-1.[2] There is no question that the arraignment was adjourned because Nackson advised the prosecutor and the court that Meltzer was incarcerated elsewhere.[3] An endeavor to serve a notice of arraignment at Meltzer's last known address was unsuccessful, and a bench warrant was issued on September 17, 1979, when Meltzer failed to appear on the adjourned arraignment date. Apparently, at some time in 1985 and again during the week of June 29, 1987, Meltzer communicated with Nackson concerning his possible return to New Jersey for disposition of the criminal charges.
After discussions with the prosecutor concerning disposition of the matter, Nackson was subpoenaed to appear before the *191 grand jury on July 2, 1987.[4] He moved to quash the subpoena requiring his appearance. In denying the motion as "premature," the motion judge indicated that the attorney-client privilege could be asserted in response to specific questions. The judge stated, "I don't necessarily know of any authority which would permit me to quash the subpoena, because if I quash the subpoena the issue dies right there.... It seems to me it's premature for me to decide the matter at this point."
Accordingly, Nackson appeared before the grand jury. Before he testified, however, the prosecutor presented testimony from Lt. Kent Bergmann of the Warren County Prosecutor's Office indicating the background and the fact that Meltzer had been indicted, had not appeared for arraignment, was the recipient of notices to appear and was a fugitive. Nackson subsequently answered many questions posed before the grand jury, but as the attorney-client privilege is a privilege of the client and requires the attorney to claim the privilege for the benefit of the client unless otherwise instructed by the client, no one suggests that any responses by Nackson to the grand jury constituted a "waiver" of the privilege. See Evid. R. 26, 37; In re Advisory Opinion No. 544 of N.J.Sup.Court, 103 N.J. 399, 405-406 (1986); Fellerman v. Bradley, 99 N.J. 493, 498 (1985). Nackson advised the jury that he had been retained by Meltzer through a Chicago law firm in 1978 or 1979; that most of the communications concerning Meltzer were through that law firm, and that "I have no address for him [Meltzer], I do  I am in possession of a telephone number, and I have dealt with a law firm in Chicago." He testified that he had a recent discussion with his client and with the prosecutor about disposition of the charges, including Meltzer's obligation to return to New Jersey to comply with any agreement that might have *192 been reached,[5] and that he had heard that his client had been arrested in Chicago on a motor vehicle offense in 1986 at which time there was a decision not to extradite to New Jersey.[6] Nackson testified that the conversations in 1985 "[were] done through the attornies [sic] in Chicago," but that he had spoken with Meltzer directly during the week of June 29, 1987. While Nackson revealed telephone numbers of his office and of the office of the attorney in Chicago, he refused to answer five questions during the course of his grand jury appearance and did so on the basis of the attorney-client privilege. Those questions were:
(1) What number did you call when you called him [Meltzer] back [during the week of June 29, 1987]?
(2) Did you advise your client that in the opinion of the Warren County Prosecutor's Office, he was a fugitive from justice?
(3) Have you advised him [Meltzer] that he should comply with the law?
(4) Can you tell the Grand Jury what his [Meltzer's] occupation is?
(5) Can you tell the Grand Jury by whom he is employed at the present time?
At the direction of the grand jury, the prosecutor filed an order to show cause why Nackson should not be held in contempt for refusing to answer these questions. The petition indicated that Nackson had represented Meltzer since 1979, and that he refused *193 to answer the five questions "upon the stated ground of attorney-client privilege." The petition continued:
6. Mark Howard Meltzer is a fugitive from justice, having failed to appear before this Court on September 14, 1979, or thereafter, to answer a criminal charge then and now pending against him, that is, a certain indictment (I 250-J-78) charging possession of marijuana and possession of marijuana with intent to distribute.
7. The information sought by the aforesaid questions would disclose or aid in disclosing the whereabouts of Mark Howard Meltzer and thus facilitate his being brought before this Court to answer to the said indictment.
8. By refusing to answer these questions, Joseph Lewis Nackson is aiding Mark Howard Meltzer in the commission of a crime, (N.J.S.[A] 2C:29-7 and 2C:29-9) and of a fraud upon the Court. See Fellerman v. Bradley, 99 N.J. 493 (1985).
9. The information sought by the aforesaid questions is not the subject of attorney-client privilege and may not properly be withheld from the Grand Jury. R.P.C. 1.6(c)(3); R.P.C. 8.4(d).
A judge of the Law Division concluded that questions two and three did not have to be answered in light of the attorney-client privilege, but that Nackson was required to answer questions one, four, and five before the grand jury, "unless prior to such time respondent has already provided such information to the Warren County Prosecutor." We granted a stay of the proceedings and leave to appeal.

II
In the course of the proceedings before us relating to the stay and leave to appeal, we raised a question concerning possible application of the Fifth Amendment privilege against self-incrimination flowing from the assertions in the petition with respect to Nackson's conduct. We directed the parties to "brief the impact of paragraph 8 of the petition for order to show cause" in light of N.J.S.A. 2C:29-3a, which proscribes hindering the "apprehension, prosecution, conviction or punishment of another." In light of the prosecutor's representation that he does not seek an indictment against Nackson and will immunize him, presumably pursuant to N.J.S.A. 2A:81-17.3, and because Nackson at this point has not personally asserted the privilege against self-incrimination in the proceedings, see *194 State v. Jamison, 64 N.J. 363, 378 (1974); In re Addonizio, 53 N.J. 107, 116-117 (1968); In re Boiardo, 34 N.J. 599, 604 (1961), we do not consider any Fifth Amendment issue or decide the case on that basis.

III
The "lawyer-client privilege," N.J.S.A. 2A:84A-20, embodied in Evid.R. 26, provides, in part, that:
communications between lawyer and his client in the course of that relationship and in professional confidence, are privileged, and a client has a privilege (a) to refuse to disclose any such communication, and (b) to prevent his lawyer from disclosing it.
There is an exception embodied in the Rule with respect "to a communication in the course of legal service sought or obtained in aid of the commission of a crime or a fraud," Evid.R. 26(2)(a). Further, "[a] communication made in the course of relationship between lawyer and client shall be presumed to have been made in professional confidence unless knowingly made within the hearing of some person whose presence nullified the privilege." Evid.R. 26(3). Although the privilege, rooted in the common law, is now embodied in statute and rule, see In re Advisory Opinion No. 544, supra, 103 N.J. at 405-406, it has constitutional dimension when the client is a criminal defendant in light of his right to counsel. See U.S. Const., Amend. VI; N.J. Const. (1947), Art. I, ¶ 10. Thus, in a criminal case, the need for confidentiality and full and candid communication between attorney and client is even greater than in any other proceeding. It is directly related to the constitutional requirement of effective assistance of counsel. See State v. Sugar, 84 N.J. 1, 15-17 (1980) (Sugar I), where Justice Pashman said for the Court:
If the rule of law is this nation's secular faith, then the members of the Bar are its ministers. A lawyer is the mediator between his client's desires and the sovereign's commands. His aid is sought because of the relative ignorance of those to whom the law is but a collection of dim mysteries. When confronted with the awesome power of the criminal process, a client is never more in need of professional guidance and advocacy. In this setting, an instinct for survival compels a defendant to confide in an attorney. The necessity of full and open *195 disclosure by a defendant imbues that disclosure with an intimacy equal to that of the confessional, and approaching even that of the marital bedroom. [Id. at 12-13 (footnote and citations omitted)].
See also State v. Sugar, 100 N.J. 214 (1985) (Sugar II), 108 N.J. 151 (1987) (Sugar III); State v. Bellucci, 81 N.J. 531, 537-538 (1980); United States v. Levy, 577 F.2d 200 (3rd Cir.1978).
Because of the significance of the constitutional right to counsel in criminal cases, the state's reliance on Fellerman v. Bradley, supra, is overstated. That case dealt with enforcement of a provision of a civil judgment requiring the client to pay an accountant's fee and concerned whether the attorney could be required to divulge his client's address for that purpose. Fellerman held that the fraud exception to the attorney-client privilege was applicable and that the attorney had to divulge the client's address.
While we do not believe that Fellerman is controlling in this instance, we do recognize that certain of its principles are applicable and must be recognized. As Justice Handler stated in that case:
Although now codified by statute, the attorney-client privilege is recognized as one of `the oldest of the privileges for confidential communications.' 8 J. Wigmore, Evidence § 2290, at 542 (McNaughton rev. 1961); see G. Hazard, `An Historical Perspective on the Attorney-Client Privilege,' 66 Calif.L.Rev., 1061, 1971 (1978); Note, `The Attorney-Client Privilege: Fixed Rules, Balancing, and Constitutional Entitlement,' 91 Harv.L.Rev. 464, 465 (1977). Over time, the primary justification and dominant rationale for the privilege has come to be the encouragement of free and full disclosure of information from the client to the attorney. See C. McCormick, Evidence § 87, at 175-76 (2d ed. 1972); Wigmore, supra, § 2290, at 543; Note, `The Attorney-Client Privilege in Class Actions: Fashioning an Exception to Promote Adequacy of Representation,' 97 Harv.L.Rev. 947, 948 (1984). This has led to the recognition that the privilege belongs to the client, rather than the attorney. J.M. Callen & H. David, `Professional Responsibility and the Duty of Confidentiality: Disclosure of Client Misconduct in an Adversary System,' 29 Rutgers L.Rev. 332, 337 (1976); Annot., `Disclosure of Name, Identity, Address, Occupation or Business of Client as Violation of Attorney-Client Privilege,' 16 A.L.R.3d 1047, 1050 (1967).
* * * * * * * *
In general, the statutory and common-law standard for determining what constitutes a privileged communication is quite broad in terms of encompassing attorney-client conversations. For a communication to be privileged it must *196 initially be expressed by an individual in his capacity as a client in conjunction with seeking or receiving legal advice from the attorney in his capacity as such, with the expectation that its content remain confidential. N.J.S.A. 2A:84A-20(1) and (3); In re Kozlov, 156 N.J. Super. 316, 321 (App.Div. 1978), rev'd on other grounds, 79 N.J. 232 (1979). See generally 8 Wigmore, supra, § 2292 at 554 (discussing when communication is privileged). [99 N.J. at 498-499].
After considering the principles embodied in Evid.R. 26, Justice Handler then discussed whether the attorney could be compelled to disclose the client's address in the circumstances before the court:
There is, however, no clear decisional consensus about whether a personal address communicated by a client to an attorney in the course of the attorney-client relationship comes within the privilege. Cases that have required disclosure of a client's address generally have not assumed that an address as such cannot be a confidential communication. The focus of these decisions dealing with a client's address is not on the jurisdictional scope of the attorney-client privilege but on its overriding purpose. Thus, some cases require the disclosure of a client's address during the pendency of litigation when necessary to promote the efficient progress of the court or to avoid frustrating the judicial process. See Sunga v. Lee, 13 Ill. App.2d 76, 141 N.E.2d 63 (1957) (privilege is pierced when, after diligent efforts, plaintiff needs address to serve absentee defendant); In re Illidge, 162 Or. 393, 91 P.2d 1100 (1939) (attorney required to disclose address of client in deposition in which plaintiff was trying to determine how jurisdiction could be obtained); Taylor v. Taylor, 45 Ill. App.3d 352, 3 Ill.Dec. 961, 359 N.E.2d 820 (1977) (recognizing that to insure smooth operation of legal machinery during a pending action in which a client's address is sought, attorney is obliged to disclose client's place of residence). Other cases have recognized that even after final adjudication, an address may be required to be revealed if necessary to prevent flouting a court's order. Mercado v. Parent, 421 So.2d 740 (Fla.App. 1982); see Jafarian-Kerman v. Jafarian-Kerman, 424 S.W.2d 333 (Mo. App. 1967) (address of client who removed child from jurisdiction in violation of limited custody order was not privileged); Falkenhainer v. Falkenhainer, 198 Misc. 29, 97 N.Y.S.2d 467 (Sup.Ct. 1950) (court required disclosure of address of client, who was not awarded custody but removed child from jurisdiction, stating that to uphold privilege would `aid and abet this defendant in frustrating the judgment of the court'); Richards v. Richards, 64 Misc. 285, 119 N.Y.S. 81 (Sup.Ct. 1909), aff'd, 127 N.Y.S. 1141 (A.D. 1st Dept. 1911) (in spite of attorney's promise to keep client's address confidential, court required disclosure; it would not aid defendant in his defiance of order directing him to pay alimony and counsel fees).
The cases do not recognize a per se exemption of a client's address from the class of communications that are protected by the privilege. The theme underlying these decisions is that the privilege itself does not furnish an absolute or immutable bar against the disclosure of a client's address. Rather, their centralizing rationale is that in this context the privilege is to be applied in *197 a manner that will be consistent with necessities of judicial policy and with the essential purpose the privilege is designed to serve.
We perceive no sound reason why the communication that consists of, or includes, a client's address should not, at least in a case such as this, be governed by the same considerations that obtain as to other communications that are accorded the privilege. We therefore decide the issues involved not on the basis of whether an address is, or may ever be, the subject of a protected confidential communication between a client and attorney but on the basis of the purposes for which the privilege exists and the reasons for its assertion in the context of the particular case. [99 N.J. at 500-502 (footnote omitted)].
Although in Fellerman the Court concluded that the client's address was not protected under the attorney-client privilege, it felt it "important to distinguish other situations in which an address may be communicated to an attorney with a legitimate expectation that it remain confidential." 99 N.J. at 506. Thus, here, as in Fellerman, we must decide the case on its unique circumstances based on "the purposes for which the privilege exists and the reasons for its assertion in the context of the particular case." 99 N.J. at 502. In so doing, we must consider the ethical obligations of an attorney as well as the statutory requirements.
In Fellerman, the Supreme Court rejected the argument that Disciplinary Rule 4-101 prevented disclosure of the client's address. However, after the attorney was ordered to divulge the address, the Disciplinary Rules were superseded by the Rules of Professional Conduct. See 99 N.J. at 507-503 n. 3; R. 1:14 as amended effective September 10, 1984. RPC 1.6(a) now provides that "[a] lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as [otherwise provided in the rule]."
The definition of confidential information contained in RPC 1.6(a) is even broader and more inclusive than that embodied in the former rule, DR4-101(A). See In re Advisory Opinion No. 544, supra, 103 N.J. at 406-407. RPC 1.6(a) "expands the scope of protected information to include all information relating to the representation, regardless of the source or whether *198 the client has requested it be kept confidential or whether disclosure of the information would be embarrassing or detrimental to the client." Id. at 406 (citation omitted). See also Current N.J. Rules of Evidence, Comment 9 to Evid.R. 26 (Gann Law Books, 1987). Hence, the information may be privileged even though it is not contained in a "communication."
In Commonwealth v. Maguigan, 511 Pa. 112, 511 A.2d 1327 (1986), the Supreme Court of Pennsylvania recently considered whether the attorney-client privilege precludes an attorney from disclosing the whereabouts of a fugitive criminal client. The attorney, Holly Maguigan, was held in contempt because she refused to comply with the court's order requiring disclosure of the whereabouts of her client.[7] The Supreme Court held that the trial court had subject matter jurisdiction to conduct the proceeding directed to ascertain the whereabouts of the fugitive who disobeyed a subpoena and the conditions of his bond. See 511 A.2d at 1332-1333. With respect to the privilege related to the communications between Maguigan and her client, Aquino, the court stated:
Aquino obligated himself to keep the court informed of his whereabouts and to make himself available at the direction of the court. He did not have the right to refuse to disclose his whereabouts to the court, nor could he have had a legitimate expectation that any information in this regard transmitted by him to his attorney would remain confidential. Since it is clear that the court had a right and an obligation to ascertain the requested information and the client had an obligation to supply that information, the only remaining question is whether the attorney-client relationship provides some basis for concluding that the attorney, who may be in possession of this information, should be permitted to refuse to disclose it. [511 A.2d at 1335].
After quoting, in part, the Code of Professional Responsibility of Pennsylvania and Disciplinary Rule 4-101(C), the court continued:

*199 Recently, the Supreme Court of the United States cited a similar provision in the Iowa Professional Responsibility Code for Lawyers in Nix v. Whiteside, [475] U.S. [157], 106 S.Ct. 988, 89 L.Ed.2d 123 (1986), noting that an exception to the attorney's duty of confidentiality is a client's announced intention to commit a crime. Although this decision is not binding upon us, we find it persuasive. Thus we must reject appellee's assertion that the information concerning Aquino's whereabouts is privileged.
Our conclusion as to the impact of the Pennsylvania Code of Professional Responsibility is also buttressed by the following formal opinion of the American Bar Association, Committee on Professional Ethics, which addressed an almost identical factual circumstance:
When the communication by the client to his attorney is in respect to the future commission of an unlawful act or to a continuing wrong, the communication is not privileged. One who is actually engaged in committing a wrong can have no privileged witnesses, and public policy forbids that an attorney should assist in the commission thereof, or permit the relation of attorney and client to conceal the wrongdoing. A defendant in a criminal case when admitted to bail is not only regarded as in the custody of his bail, but he is also in the custody of the law, and admission to bail does not deprive the court of its inherent power to deal with the person of the prisoner. Being in lawful custody, the defendant is guilty of an escape when he gains his liberty before he is delivered in due process of law, and is guilty of a separate offense for which he may be punished. In failing to disclose his client's whereabouts as a fugitive under these circumstances the attorney would not only be aiding his client to escape trial on the charge for which he was indicted, but would likewise be aiding him in evading prosecution for the additional offense of escape.
It is the opinion of the committee that under such circumstances the attorney's knowledge of his client's whereabouts is not privileged, and that he may be disciplined for failing to disclose that information to the proper authorities. Equally, the attorney may be disciplined if, upon his client's refusal to surrender upon his advice, he continues to act as his attorney, if the fugitive persists in so evading a trial upon the charges against him, the attorney should terminate their relations. Failing in this, the attorney is guilty of a violation of his oath and of his duty to society. ABA Formal Opinion No. 155 (May 4, 1936). [511 A.2d at 1336].
Noting that the attorney knew that Aquino would not appear for trial and had general information as to his whereabouts, the Pennsylvania court continued:
It is clear that the lawyer's fidelity to the client does not extend to aiding and abetting a client in criminal activities, nor can the client have a legitimate expectation of such confidences. [Ibid. (citations omitted)].
The court concluded:
Here Aquino sought appellee's professional services to obtain legal representation to defend against sexual assault charges. The information relating to *200 the initial charges for which the representation was sought and established is separate and distinct from the client's subsequent decision to flee the jurisdiction of the court. Appellee has at no point suggested that she is now representing Aquino for the possible future charges of being a fugitive. Moreover, an attempt to represent Aquino for this charge under these circumstances would amount to appellee becoming an accessory in Aquino's continuing criminal conduct. This is prohibited and clearly does not serve as the basis of an acceptable attorney-client relationship. Thus, in this case, it was the communications relating to the circumstances surrounding the sexual assault charges which were essential to the attorney-client relationship and not those communications relating to Aquino's unlawful decision to remove himself from the jurisdiction of the court during the pendency of those charges.
* * * * * * * *
Our analysis thus leads us to conclude that where a client is under conditions of bail and defies a lawful court order to appear, his `whereabouts' are not unqualifiedly protected by the attorney-client privilege, and the attorney may be compelled to disclose information of the client's whereabouts. Under the instant facts, the privilege cannot be maintained. [511 A.2d at 1337].
We do not read the Maguigan opinion as in any way turning upon the fact that Aquino became a fugitive upon release on bond or that there is any distinction between one who becomes a fugitive just before trial (as Aquino appears to have done) and one who never appears for arraignment (with or without prior arrest), at least where counsel has commenced to represent him on the charges. However, as Maguigan implies, there may be a distinction between communications with counsel retained to represent a client as a result of his fugitive status or in light of charges relating to same, and communications with an attorney who represented a defendant at the time he became a fugitive. While this distinction may be significant in an application before a trial judge in a proceeding to determine the whereabouts of a fugitive, it has, in our view, no relevance in the grand jury setting in this case.
In Matter of Grand Jury Subpoenas Served Upon Field, 408 F. Supp. 1169 (S.D.N.Y. 1976), the United States District Court held that the client's communications to his attorneys regarding his address when given in connection with receipt of information concerning relocation was privileged. There, the *201 client, Carlo Bordoni, had been indicted by the grand jury that was seeking his appearance as a witness. Field's firm had represented Bordoni in various matters, and Bordoni had requested the firm "to review the laws of a number of named jurisdictions in connection with Bordoni's proposed change of residence," 408 F. Supp. at 1171, presumably to avoid extradition, although "the Court has been made aware of no criminal investigation or suit which was pending against Bordoni at the time he relocated," 408 F. Supp. at 1171. In its discussion the court stated:
The grand jury has traditionally been accorded wide latitude to inquire into violations of the criminal law and the duty of every citizen to testify has long been recognized. [citations omitted]. The power of the federal court to compel persons to appear and testify is not in doubt. Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) [rehearing den. 408 U.S. 931, 92 S.Ct. 2478, 33 L.Ed.2d 345 (1972)]. Further, it has been held specifically that the grand jury may inquire as to the whereabouts of unlocated witnesses. Hoffman v. United States, 341 U.S. 479, 488, 71 S.Ct. 814 [819] 95 L.Ed. 1118 (1951). Thus, there is no question in this case of the grand jury's general power to engage in the inquiry in question.
It is equally well-settled that the subpoena powers of the grand jury are not unlimited. Specifically, the Supreme Court has noted that the grand jury `may not itself violate a valid privilege, whether established by the Constitution, statutes or the common law.' [citations omitted]. In this instance the petitioners assert that to compel their testimony would violate the attorney-client privilege. Therefore, the first question to be addressed is whether the information sought from Field and DiFalco i.e., the whereabouts of their firm's client Bordoni, is within the attorney-client privilege.
The purpose of the attorney-client privilege is to promote freedom of communication among attorneys and their clients by removing the fear of compelled disclosure by the lawyers of confidential information conveyed for the purpose of receiving legal advice. [408 F. Supp. at 1171-1172 (citations omitted)].
With respect to the facts of the case, the court stated:
[T]his is not a case in which the fact of retention of counsel by a certain individual is in question. [citations omitted]. Nor is it a case in which information is being withheld to frustrate a judgment of the court. [citation omitted] In this Court's view, a determination of whether the client's whereabouts must be disclosed will depend on an analysis of the facts of the case and the nature of the communication involved. See In re Stolar, 397 F. Supp. 520, 524 (S.D.N.Y. 1975).
* * * * * * * *

*202 The evidence shows that Bordoni's attorneys learned of his whereabouts precisely because he sought their advice with respect to that very matter. The Court concludes that on the facts of this case, the residence and whereabouts of Bordoni were communicated to these attorneys in confidence, as an incident to the obtaining of legal advice and as part of an attorney-client relationship. Therefore, this is a communication within the scope of the privilege.
The attorney-client privilege is not absolute. [citation omitted]. Wigmore has said that it `ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.' Wigmore at § 2291. The Court believes this ruling to be in accord with this principle. The Court does not hold that a client's address is information which always falls within the privilege. As with a client's identity, it may be only in rare instances that this information will be protected [citations omitted]. Certainly the information will not be considered privileged simply because the client communicated his address to his attorney to enable him to receive advice about matters having nothing to do with that information. However, where as here, the address is communicated for the specific purpose of receiving legal advice and the address itself is at the heart of the advice sought, it would defy the logic of the attorney-client privilege to hold that the communication is not within the scope of that privilege.
The Court notes that there is no allegation that the advice rendered by counsel in this case was given for the purpose of aiding Bordoni in the commission of any crime. Nor is there any claim that the advice was rendered in bad faith to enable the defendant to avoid any criminal investigation or proceeding pending at the time the advice was given. Nor is there any allegation that the advice was rendered to enable Bordoni to avoid lawful process in any proceeding pending at the time the advice was given. [408 F. Supp. at 1172-1174.]
Unlike Field, the recent communications between Meltzer and his attorney included his whereabouts or a telephone number where he could be reached after having become a fugitive. However, although the record was not developed before the grand jury or the judge on the order to show cause, there appears to be an uncontested suggestion that the recent communications between Meltzer and his attorney included discussion of an endeavor to dispose of all outstanding charges including those which flowed (or potentially flowed) from his nonappearances. It is uncontested that Nackson and Meltzer had not communicated for about six years and that the recent communications, after all that time, were in the context of his fugitive status. We do not necessarily conclude that inquiries could never have been addressed, under the precedent, to *203 Nackson about the whereabouts of his client. We must consider only whether Nackson had to answer the questions asked by the grand jury in the "context of the particular case." See Fellerman v. Bradley, supra, 99 N.J. at 502.
As a result of the grand jury testimony of July 2, 1987, Meltzer was indicted as a fugitive for bail jumping. In response to our inquiries at oral argument, and in its brief, the State indicates that it seeks responses to the questions from Nackson because bail jumping is a continuing offense and the grand jury has a right to return a further indictment or indictments. We do not disagree with that thesis in the abstract, but the grand jury had sufficient information to indict, and information concerning Meltzer's fugitive status could be obtained and solicited from others, including public records of Warren County. Moreover, although it is not contained in the appendix, we are advised that the indictment against Meltzer for bail jumping (indictment XX-XX-XXXX) alleged that from September 14, 1979 to July 2, 1987 he failed to appear as ordered to answer on the former indictment. Defendant's exact whereabouts or location at relevant times is not an element of the offense of bail jumping, see N.J.S.A. 2C:29-7, or criminal contempt, N.J.S.A. 2C:29-9. Accordingly, it is clear that the information necessary to return another indictment based on Meltzer's fugitive status could be obtained from less intrusive sources than his attorney. See In re Kozlov, 79 N.J. 232 (1979), where our Supreme Court set aside a judgment of contempt involving an attorney's failure to reveal his client's identity because it was not sufficiently shown "to the satisfaction of `the trial judge ... the information ... could not be secured from any less intrusive source.'" 79 N.J. at 244 (citation omitted; emphasis in original). See also United Jersey Bank v. Wolosoff, 196 N.J. Super. 553, 563-564 (App.Div. 1984).
It was also suggested before the grand jury and in the argument before us that the grand jury was endeavoring to *204 locate the whereabouts of Meltzer in order to secure his presence for trial.
We recognize that:
It never was our rule that a grand jury may explore only specific charges already made. See State v. Magrath, 44 N.J.L. 227 (Sup.Ct. 1882). The grand jury may investigate upon its own suggestion, and in addition to indictments for crime, it may return `presentments' upon conditions of public interest even though no violation of a penal statute is found. [citations omitted] [In re Addonizio, supra, 53 N.J. at 124].
* * * * * * * *
Indeed, it may be urgent that a rumor be pursued, to relieve the public of the evil if the rumor is true and the burden of the rumor if it is false. And if the investigation is to be meaningful, `Some exploration or fishing necessarily is inherent and entitled to exist in all documentary productions sought by a grand jury.' Schwimmer v. United States, 232 F.2d 855, 862-863 (8 Cir.), cert. denied, 352 U.S. 833, 77 S.Ct. 48, 1 L.Ed.2d 52 (1956).
We repeat that the authority of a grand jury to make a criminal investigation need not be shown, and that he who asserts an abuse must prove it. [Id. at 126.]
We do not retreat from that principle; nor do we interfere with the discretion of the prosecutor to determine the matters to be presented to the grand jury. Cf., e.g., State v. Leonardis, 73 N.J. 360 (1977) (review of prosecutor's decision concerning P.T.I.). However, the prosecutor cites no authority by which a grand jury can seek, at least from a criminal defendant's counsel, the whereabouts of a fugitive for purposes of execution of a warrant or by which it can obtain discovery after the return of an indictment. Cf., Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951) (non-lawyer has Fifth Amendment privilege not to answer); see also Matter of Doe, 456 N.Y.S.2d 312, 117 Misc.2d 197 (Co.Ct. 1982) (holding that attorney-client privilege did not extend to grand jury inquiry as to whereabouts of fugitive).
In In re Stolar, 397 F. Supp. 520 (S.D.N.Y. 1975), the grand jury sought the address of Stolar's client, whom the F.B.I. wanted to interview in order to ascertain the whereabouts of a third party. The court quashed the subpoena, stating in part:
There is no question but that a grand jury has the right and the duty to search out, examine and weigh whatever evidence there may be in connection with a suspected crime. In order to fulfill its primary function of returning *205 indictments against individuals believed to have committed serious crimes the powers of the grand jury must necessarily be exceedingly broad. Branzburg v. Hayes, 408 U.S. 665, 688, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972). It may properly investigate on the basis of tips, rumors, hearsay, speculation or any other source of information. Costello v. United States, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956) [rehearing den. 351 U.S. 904, 76 S.Ct. 692, 100 L.Ed. 1440 (1956)]. It has been noted that a grand jury's task `is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find if a crime has been committed.' United States v. Stone, 429 F.2d 138, 140 (2d Cir.1970). Nevertheless, it must be remembered that the grand jury is endowed with these expansive powers so that it may `inquire into the existence of possible criminal conduct and .. . return only well-founded indictments.' Branzburg, supra, 408 U.S. at 688, 92 S.Ct. at 2660. Indeed, there are matters into which a grand jury may not inquire simply because they fall outside the area of its proper functions. Clearly, for example, a grand jury may not be empanelled nor its process used solely to inquire into a strictly civil matter. See United States v. Doe, 341 F. Supp. 1350 (S.D.N.Y. 1972) (Frankel, J.). And even when the grand jury is generally acting within its normal limits care must be taken to ensure that its historic functions are not subverted nor its powers abused. For instance, the Second Circuit Court of Appeals has recently reaffirmed the principle that a grand jury may not be used `for the sole purpose of preparing an already pending indictment for trial.' United States v. Del Toro, 513 F.2d 656, 664 (2d Cir.1975) [cert. den. 423 U.S. 826, 96 S.Ct. 41, 46 L.Ed.2d 42 (1975)]. It has also been recognized that the grand jury process may not be used by a federal prosecutor solely to conduct his own investigation. Durbin v. United States, 94 U.S.App.D.C. 415, 221 F.2d 520, 522 (1954).
* * * * * * * *
.... [Here] the grand jury subpoena is being used not in aid of its proper functions but rather as an adjunct or tool of an FBI investigation. In this Court's view, such a procedure is impermissible. Congress has not chosen to vest the FBI with subpoena powers and it would circumvent that legislative judgment for the FBI to be allowed to instead simply make use of the grand jury process in order to do indirectly what it may not do directly. [Id. at 522-523].
Similarly, our Rules give the prosecutor no pretrial subpoena power independent of the grand jury. See State v. Hilltop Private Nursing Home, Inc., 177 N.J. Super. 377, 389-390 (App.Div. 1981).
While Stolar's client was sought for investigative purposes and only as a mere witness, the court held that the privilege protected revelation by the attorney of his address and place of employment, stating:
The general purpose of this privilege is `to promote freedom of consultation of legal advisers by clients.' 8 Wigmore, Evidence, § 2291 (McNaughton rev. 1961). To this end the client must be assured that information conveyed in *206 confidence to the attorney will not be ordinarily disclosed. Arrayed against this consideration is the public interest in obtaining disclosure of every man's evidence. See In re Horowitz, 482 F.2d 72, 81 (2d Cir.), cert. denied, 414 U.S. 867, 94 S.Ct. 64, 38 L.Ed.2d 86 (1973) [rehearing den. 414 U.S. 1052, 94 S.Ct. 556, 38 L.Ed.2d 340 (1973)]. When these two principles clash a balance must be struck and an appropriate resolution will not be forthcoming by a wooden application of some general formula. The answer may lie, instead, in an analysis of the particular circumstances giving rise to the problem, ever mindful of the policy considerations which furnish a basis for the two principles.
Sheperd was aware that he was being sought for questioning by the FBI  although apparently not in connection with any claimed crime on his part. He was not disposed to reveal his whereabouts to that agency. When Sheperd telephoned Stolar he made known his misgivings and sought counsel with respect to his legal rights. Stolar agreed to provide such legal advice. During the course of that conversation Sheperd gave the attorney his telephone number. As part of the attorney-client discussions which thereafter took place Sheperd also disclosed his home address and the name of the place where he was employed. The Court is of the opinion that the information sought was communicated to the attorney confidentially and solely for the purpose of receiving legal advice. Under the circumstances Sheperd had a legitimate basis to expect that such information disclosed to his attorney was made in confidence and would not be revealed. [Id. at 524].
It is true, as the prosecutor suggests, that there could be a superseding indictment or a new indictment against Meltzer for his nonappearances. However, as noted, there are less intrusive means for obtaining the information necessary for presentation of the matter to the grand jury for purposes of obtaining an indictment. Cf. In re Kozlov, supra. We do not purport to limit the quality or quantity of proofs that may be presented to the grand jury; it is well-recognized that an indictment may be based largely or wholly on hearsay or evidence which would not be admissible at trial, see e.g., State v. Schmidt, 213 N.J. Super. 576, 584 (App.Div. 1986), certif. granted 107 N.J. 635 (1987); see generally "Report on the Grand Jury of the New Jersey State Bar Association's Committee on the Grand Jury," 100 N.J.L.J. 393, 406-07 (1977). Historically a grand jury "has been accorded wide latitude to inquire into violations of [the] criminal law." United States v. Calandra, 414 U.S. 338, 347, 94 S.Ct. 613, 38 L.Ed.2d 561, 568 (1974); State v. Ferrante, 111 N.J. Super. 299, 304-306 (App. Div. 1970). However, at least when there are less intrusive means for obtaining information necessary to return an indictment *207 against the client of an attorney, those means must be pursued to avoid any infringement on the cherished Sixth Amendment and state constitutional right to counsel.
We reject Nackson's suggestion that, at least without prior judicial approval, an attorney cannot be subpoenaed to appear before a grand jury to answer questions in an investigation where his client is the target, see e.g. In re Selser, 15 N.J. 393 (1954); State v. Toscano, 13 N.J. 418 (1953); compare United States v. Klubock, 832 F.2d 664 (1st Cir.1987). However, we do hold that the aggregate of circumstances (where the grand jury has already returned an indictment charging Meltzer as a fugitive, where there are other means of obtaining information that the defendant is a fugitive and of developing the record in support of an indictment or presentment, and where the prosecutor is employing the grand jury as his investigative arm to obtain information unrelated to the indictment) requires that the attorney cannot be compelled to answer questions before the grand jury concerning the whereabouts of his client.
Accordingly, the order under review is reversed.
NOTES
[1] We granted leave to appeal from the order directing Nackson to answer the questions in order to avoid any issue concerning the appealability, as of right, from such an order in the absence of an adjudication of contempt or incarceration. See, e.g., In re Addonizio, 53 N.J. 107 (1968). The parties appear to agree that the proceedings before the Law Division were conducted in aid of litigant's rights, see R. 1:10-5, and that violation of the court's order would undoubtedly result in incarceration of Nackson until he complies. See, e.g., Shillitani v. United States, 384 U.S. 364, 370-371, 86 S.Ct. 1531, 1535-1536, 16 L.Ed.2d 622, 627 (1966); Napoli v. Eld, 76 N.J. 524 (1978); Catena v. Seidl, 65 N.J. 257, 262 (1974), 66 N.J. 32 (1974) and 68 N.J. 224 (1975).
[2] According to Nackson's testimony before the grand jury, he commenced to represent defendant prior to the indictment. He stated, "I'm not sure of the exact date, I would think from sometime either 1978 or 1979."
[3] It is clear from the transcript of grand jury proceedings of July 2, 1987 that Nackson actually advised the prosecutor that Meltzer was incarcerated in Illinois and that he had received this information from a law firm in Chicago which had referred the case to him. Apparently, Mr. Nackson also advised the prosecutor that Meltzer had been institutionalized in a mental health facility. According to Nackson's grand jury testimony, "[a] recollection or a review of my correspondence indicates that I was told that he was for a while, in the summer of 1979, hospitalized in a mental hospital out in  I believe it was Illinois, on an involuntary basis, which I indicated to the Prosecutor's Office, and subsequent to that, he was in a jail in Illinois, and I also indicated that to the Court."
[4] At the time of the argument on the order to show cause on July 31, 1987, it was stated that Nackson and the prosecutor spoke in June of 1987 "with regards to the surrender of the client and disposition of the case."
[5] Nackson testified that he spoke to the prosecutor in 1985, although he "couldn't pin it down to a specific date," and he further indicated:

I certainly recall having a conversation with Mr. Hare [the Warren County Prosecutor] in 1985, and that I was looking to see if we could work out an arrangement where Mr. Meltzer would plead guilty to the charge of possession and be eligible for an application to the ... Section 27, first offenders program [N.J.S.A. 24:21-27], but I don't know that  if I ever used the language that he would surrender himself if that was done. Obviously, talking about a plea, it's predicated on him surrendering himself, and certainly we had discussions about surrendering himself and that plea arrangement, but I don't know if it would be fair to say that it was one for the other.
Nackson also advised the grand jury that he spoke to Meltzer by telephone the week before his grand jury appearance of July 2, 1987.
[6] Lt. Bergmann testified that the prosecutor's file did not reveal any decision regarding whether to extradite Meltzer from Chicago.
[7] The attorney also raised a Fifth Amendment claim which the court did not consider because of the prosecutor's representation that he did not intend to charge the attorney with harboring a fugitive and because immunity was granted. Id., 511 A.2d at 1329-1333.